No. 2--06--0683        Filed:  7-25-08

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Winnebago County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 05--CF--2843 |
| ERNEST D. KING, | ) ) ) | Honorable Steven G. Vecchio, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE O'MALLEY delivered the opinion of the court:

Defendant Ernest King appeals from his convictions of two counts of robbery (720 ILCS 5/18--1 (West 2004)), one count of aggravated battery (720 ILCS 5/12--3 (West 2004)), and one count of residential burglary (720 ILCS 5/19--3 (West 2004)) against three different victims.  On appeal, defendant argues that the trial court erred in refusing to try his offenses separately, that the State improperly elicited testimony regarding his decision to invoke his constitutional right to silence in the face of police questioning, and that the trial court erred in ruling that three of his four 10-year sentences should run consecutively.  For the reasons that follow, we affirm.

Officer Richard DeVlieger of the Rockford police department was the first witness for the State at defendant's April 19 and April 20, 2006, jury trial.  He testified that, at approximately 9:45 p.m. on May 11, 2005, he traveled to a residence near West Riverside and Rockton Avenue to respond to a security alarm that had been triggered.  When DeVlieger arrived, he saw Sharon

Provenzano, who had "some scratches" on her hand and was "shaken, upset." Prior to the incident that led to her injuries, she had seen a silver sedan in the area. She gave DeVlieger a description of the suspect in connection with the incident.

Sharon Provenzano testified that, on the night of May 11, 2005, she arrived home between 9:30 and 9:45 p.m. After she pulled her car into her garage, she heard her house alarm, so she took her cellular telephone and her purse out of her car and attempted to contact her alarm company to insure that police were coming to investigate the problem. As she was dialing, she saw a "lighter colored" car pass her house, turn around, and come back towards her house. Before she could finish dialing, "all of a sudden someone came around the side *** of [her] house *** and threw [her] to the ground." Her assailant took her purse and telephone as she was being knocked down. When shown her telephone records, Provenzano did not recognize any of the telephone numbers that were called shortly after her telephone was taken. Those telephone calls included one call placed at 9:52 p.m. to a number later associated with a girl named Ashley Smart.

Officer Eric McLain testified that he was dispatched to a residence "about eight blocks to the north of the intersection of Kilburn and Auburn Street" at 10:32 p.m. on May 31, 2005. At the residence, he spoke with Datie Parker, who had a slight injury on her arm and was "upset." She gave McLain a description of a man who had taken her purse.

Datie Parker testified that, on the night of May 31, 2005, she returned home between 9:30 and 10:30 p.m. After she parked her car, she got out and opened the door to the backseat in order to retrieve some items she had placed there. As she opened the door, she "felt a tug" on her purse. Her assailant "pulled [her purse] to the point of bruising [her]," until it fell to the ground and he picked it up. Parker's cellular telephone was in her purse, and she testified that she did not recognize

the numbers (or associated names) of people called with her telephone after her purse was stolen. Those calls included a call at 10:17 p.m. to a telephone number later associated with Ashley Smart.

Officer Jonathan Deutsch of the Rockford police department testified that he was dispatched to a location near Church and Halsted streets in Rockford at approximately 11:25 p.m. on June 3, 2005, to respond to an " 'in progress' call of a home invasion." When he arrived, he spoke with Kathleen Appino, who furnished a description of the intruder.

Kathleen Appino testified that, just after she and her husband arrived home at approximately 11 p.m. on June 3, 2005, she looked out the door of their house and saw a "strange car" parked across the street. She then heard a "movement" coming from behind her, and, when she turned around, an intruder attacked her. They struggled until Appino's husband heard them from inside the home and rushed out to the garage; at that point, the assailant fled to a white vehicle, which drove away. Appino and her husband then noticed that her purse, as well as some other personal items, were missing. Appino testified that she did not make any of the calls that were made after the incident via the couple's cellular telephone. The calls that were placed via her telephone included a call placed at 11:24 p.m. to a number later associated with a girl named LaCreacia Simmons. Some time after her attack, police showed Appino a photographic lineup, and she narrowed the lineup down to two pictures before settling on a picture of defendant and indicating that she was "[p]retty sure," but "not a hundred percent" certain, that the picture depicted her attacker.

Detective Jason Bailey testified that he was assigned to investigate the above robberies, and he obtained the phone records for the cellular telephones of the victims. When he reviewed the phone records, he saw that there were four telephone numbers that had been dialed "frequently through *** all three phone records." He then interviewed the people to whom the calls had been

placed, and the information he gained led him to defendant. Bailey brought defendant to the police station for an interview, and, after defendant waived his right to remain silent pursuant to Miranda v. Arizona, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966), Bailey and another detective began asking defendant questions. Defendant initially denied any knowledge of the robberies, but, when confronted with the telephone evidence police had amassed, defendant eventually told Bailey, " 'So I had the phones. That doesn't mean I robbed anybody.' " Bailey described what happened at that point in the interview:

"I asked him *** to explain to me how he got the phones ***. And he sat silent. I offered him the opportunity to explain *** who else would have been making these phone calls. And he sat silent. Through a little further questioning he eventually asked that we end the interview which we did."

Ashley Smart, whose telephone number matched a number called from all three victims' telephones after the phones were stolen, testified that defendant had called her "[t]hree or four times" "[a]t night." She further testified that she did not know any of the victims. Caralyn Simmons testified that defendant called her "[a] couple times a day" in May and June 2005, and the telephone number for her house at that time matched one of the telephone numbers called using the victims' telephones. On cross-examination, she indicated that defendant would call her from his own telephone. LaCreacia Simmons testified that defendant called her during the relevant time period from two different telephones, and her telephone number also matched one of the frequently dialed numbers Bailey identified during his testimony. Tikila Jackson, who also had a telephone number that matched one of the frequently called numbers, testified that defendant called her "[e]very day"

during the relevant time period. Jackson recalled that defendant called her from "[a] lot" of different phone numbers.

Detective Randy Berke testified that he worked with Bailey in investigating the above crimes, and he said that they compared the victims' telephone bills because "there were similarities in the crimes" so they "wanted to see if there were any similar phone numbers that were called." He testified that he and Bailey discovered several telephone numbers that were called using all three stolen phones. He agreed that those numbers included ones for Jackson, Simmons, and Smart.

After Berke's testimony, both sides rested their cases and submitted closing arguments to the jury. The jury found defendant guilty on all four charged counts.

At defendant's sentencing hearing, neither side presented any testimony. Defendant's presentence report indicated that he was 22 years old and had prior arrests for resisting a peace officer, criminal trespass to a vehicle, unlawful use of weapons, and burglary, along with several traffic infractions. Defendant also had a juvenile record that included adjudications for battery and burglary. Defendant had been unemployed since February 2005. The presentence report also contained victim impact statements.

In imposing sentence, the trial court indicated that it was "fully in agreement with the State in terms of the seriousness of" defendant's crimes and criminal history and that it was "convinced that *** it [was] necessary *** to impose consecutive sentences to protect the public from further criminal conduct." The court went on to explain its assessment that defendant had "learned nothing" from his prior misconduct and "expressed no remorse" for his conduct, and the court emphasized the negative effect of defendant's actions on his victims. The court then sentenced defendant to 10 years' imprisonment for each of his four crimes, with the sentences for the two counts pertaining to

Provenzano to run concurrently and the other two sentences to run consecutively, for a total of 30 years' imprisonment. Defendant timely appeals.

Defendant first argues that the trial court committed reversible error by allowing all four of the above charges to be joined in a single trial. The issue of joinder was raised in the trial court, and defense counsel argued that the incidents were discrete and could not be considered part of the same transaction and that the joinder of all of the charges against defendant would be unduly prejudicial (there were seven counts pending against defendant from six different complainants). The State agreed to separate the four counts discussed herein from the remaining counts, but it opposed further severance, on the grounds that the crimes were all part of the same transaction and that the evidence would be admissible as other-crimes evidence of modus operandi even in separate trials, so that any prejudice caused to defendant by the joinder of the present four counts would be greatly diminished. The trial court ruled as follows:

> "[I]f this case went to trial, would I allow proof of other crimes in at the trial[?] And--and with respect to [the four counts discussed herein] it certainly appears on the initial review of the documents before [the court] that the answer would be yes because there is a--there certainly are similarities in the *** age of the victims, the locations of the victims, *** the common method of operation, the same modus operandi basically. So *** the Court *** would allow in evidence of those other crimes."

Defendant's first argument on appeal is that the trial court erred in joining the charges against him. However, we need not reach the issue, because we agree with the State that, even if joinder was improper here, any error was harmless, because evidence of all three of defendant's alleged attacks would have been admissible as other-crimes evidence in each trial if the charges against defendant

had been severed. Indeed, "where *** 'other crimes' evidence is properly admissible, the potential prejudice to a defendant of having the jury decide two separate charges is greatly diminished because the jury is going to be receiving evidence about both charges anyway." (Emphasis omitted.) People v. Trail, 197 Ill. App. 3d 742, 746 (1990). The trial court in its ruling appears to have adopted this line of reasoning. The question becomes, then, whether the other-crimes evidence here would have been admissible in each of defendant's three trials had the charges against him been separated.

Because " 'the law distrusts the inference that because a man has committed other crimes he is more likely to have committed the current crime' " (People v. Cruz, 162 Ill. 2d 314, 348 (1994), quoting People v. Lehman, 5 Ill. 2d 337, 342 (1955)), evidence of other crimes is not admissible unless it is relevant for some purpose other than to show the defendant's propensity to commit crimes (Cruz, 162 Ill. 2d at 348). However, such evidence is admissible "where relevant to prove modus operandi, intent, identity, motive or absence of mistake" or even "if it is relevant for any purpose other than to show the propensity to commit crime." People v. Illgen, 145 Ill. 2d 353, 364-65 (1991). When evidence of other crimes is offered, the trial court must weigh its probative value against its improper prejudicial effect and may exclude the evidence if the prejudicial effect substantially outweighs its probative value. Illgen, 145 Ill. 2d at 365. A trial court's decision that the probative value of other-crimes evidence outweighs its improper prejudicial effect will not be reversed on appeal absent an abuse of discretion. See People v. Wilson, 214 Ill. 2d 127, 141 (2005) ("the trial court did not abuse its discretion in determining that the probative value of the [other-crimes evidence] outweighed any undue prejudice to defendant").

The State appears to premise its argument on this point on the idea that the evidence of defendant's other crimes was admissible to establish modus operandi. Though the supreme court has

indicated that other-crimes evidence offered for some purpose other than to establish propensity is generally admissible where it bears "some threshold similarity" to the crime charged, it has held that, "[i]n cases where evidence of other crimes is offered *** to establish modus operandi ***, a 'high degree of identity' between the facts of [the crimes] has been required." Cruz, 162 Ill. 2d at 349, quoting Illgen, 145 Ill. 2d at 373. This higher standard for modus operandi evidence is required "because modus operandi refers to a pattern of criminal behavior so distinctive that separate crimes are recognized as the handiwork of the same wrongdoer." Cruz, 162 Ill. 2d at 349; see also People v. Willer, 281 Ill. App. 3d 939, 954 (1996) (modus operandi refers to cases in which "both crimes share peculiar and distinctive features not shared by most offenses of the same type and which, therefore, earmark the offenses as one person's handiwork").

Defendant urges that the facts underlying the alleged crimes here fail to establish modus operandi under the stringent test articulated by our supreme court. We agree with defendant that the State's reliance on the time between the offenses is inapposite, because it has no bearing on modus operandi. We further agree with defendant that some of the circumstances of these crimes are virtually indistinguishable from most any mugging or robbery. However, we disagree with defendant that there are no distinctive elements among the crimes to establish modus operandi. In each of these cases, the perpetrator lay in wait at or near a female victim's home as she arrived home at night, and he attacked the victim either in her garage or in another parking area adjacent or nearly adjacent to her home. Within minutes of each attack, a call was placed using the victim's cellular telephone to one of two girls. (The evidence indicated that the attack on Provenzano took place around 9:30 or 9:45 p.m., and Ashley Smart was called on her telephone at 9:52 p.m. Likewise, the attack on Parker occurred between 9:30 and 10:30 p.m., and Smart was called at 10:17 p.m. Finally, the attack on

Appino occurred at approximately 11 p.m., and a call was placed to LaCreacia Simmons at 11:24 p.m.) Other calls were also later placed via each victim's telephone, and Smart and Simmons were called using all three telephones. These peculiar similarities provide the type of criminal fingerprint that readily identifies these crimes with defendant. In fact, as Detectives Bailey and Berke testified, the similar phone calls were the identifying link police used to establish defendant as a suspect in these crimes in the first place. (We note tangentially that, since the common phone calls were used to identify defendant as the perpetrator, at least some evidence of each robbery would have been admissible on that ground if the trials had been severed. See People v. Novak, 94 Ill. App. 3d 1024, 1028-29 (1981) (officer allowed to testify that defendant had been arrested for another crime admissible in his murder trial where police identified him as a murder suspect after noticing bloodstains on his pants after he was arrested).) These telephone calls provide the high degree of unusual similarity among the crimes necessary to establish modus operandi.

Defendant further argues that, even if some other-crimes evidence was admissible to show modus operandi, the trial court's decision to allow the State to introduce its whole case on all four counts (as well as to call upon the jury to decide all four counts), as opposed to only the evidence necessary to show modus operandi, caused him undue prejudice. We disagree that the evidence adduced unjustifiably exceeded the scope needed to demonstrate modus operandi. In order to be put in context and made relevant to the idea that the calls were part of a common method of operation, the evidence of the telephone calls needed to be connected to preceding robberies. In concert with the victims' testimony regarding the attacks, the phone call evidence tended to show that defendant operated by stealing telephones and then immediately calling one of two girls. Thus, at least some

evidence of each underlying crime was required to demonstrate the relevance of the phone records as modus operandi evidence.

Defendant argues that, even if some evidence was required, allowing each victim to testify in full regarding her attack was excessive. However, our review of the record convinces us that the victims' testimony was purely factual and relatively brief. Aside from Provenzano's testimony, adduced by the defense in an attempt to impeach her recollection, that she was upset immediately after she was attacked, the victims' testimony lacked any explicit reference to the emotional effect of the attacks on the victims. Given the appreciable discretion afforded the trial court in this type of situation, we cannot say that the record discloses sufficient grounds for overturning the trial court's implicit determination that the value of the other-crimes evidence here was not outweighed by the undue prejudice the evidence may have caused.

Defendant further argues that Appino's testimony was unfairly prejudicial because she was shown a photo lineup and gave a tentative identification of defendant, while the other victims were unable to identify defendant. Thus, according to defendant, the joinder of all four counts allowed the State to use Appino's testimony "to compensate for weaknesses in its case inasmuch as Provenzano and Parker were unable to identify their attackers." However, Appino's identification testimony was highly qualified--she testified that she chose one photograph out of several shown to her but was not "a hundred percent sure" or was "[p]retty sure, not a hundred percent." In contrast, the telephone records, when combined with the testimony that defendant called the girls who received the calls from the victims' phones, provided very strong identifying information that would have been admissible in each trial even if these charges were severed. Based on the strength of the telephone evidence as identifying evidence, we cannot agree with defendant that the State used

Appino's testimony to compensate for a weakness in its case, nor can we agree that Appino's identification was unduly prejudicial to defendant on the charges unrelated to Appino. Again, we will not disturb the trial court's application of discretion under these circumstances. Accordingly, we reject defendant's argument that his conviction must be reversed and the charges against him separately retried due to misjoinder.

Defendant's second argument on appeal is that the State improperly elicited testimony that he remained silent during police questioning and thus violated the protections announced in Doyle v. Ohio, 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240 (1976). In Doyle, the prosecution presented testimony that the defendants had failed to offer exculpatory information to police just after being arrested. The Supreme Court reasoned that "[s]ilence in the wake of [Miranda] warnings may be nothing more than the arrestee's exercise of *** Miranda rights" and, thus, "every post-arrest silence is insolubly ambiguous." Doyle, 426 U.S. at 617, 49 L. Ed. 2d at 97, 96 S. Ct. at 2244. Since "it would be fundamentally unfair *** to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial" after the implicit assurance from Miranda warnings that silence will carry no penalty (Doyle, 426 U.S. at 618, 49 L. Ed. 2d at 98, 96 S. Ct. at 2245), the Supreme Court held that "the use for impeachment purposes of [an arrestee's] silence, at the time of arrest and after receiving Miranda warnings, violate[s] the Due Process Clause of the Fourteenth Amendment" (Doyle, 426 U.S. at 619, 49 L. Ed. 2d at 98, 96 S. Ct. at 2245). Defendant argues that here, just as in Doyle, the State improperly elicited evidence of his silence in response to questioning after defendant had been given Miranda warnings. We disagree.

Defendant's argument is squarely foreclosed by our supreme court's decision in People v. Patterson, 217 Ill. 2d 407 (2005). There, the defendant was advised of his Miranda rights and agreed

to speak with police, but, during the subsequent interview, he declined to answer three of the officers' questions. Patterson, 217 Ill. 2d at 444. The State presented testimony regarding the defendant's silence in response to some of the police questioning, and, on appeal, the defendant argued that the State's actions violated Doyle. Patterson, 217 Ill. 2d at 444. The supreme court refuted the argument in short order:

> "Doyle applies only when a defendant invokes his right to remain silent. [Citation.] Here, defendant waived his right to remain silent and answered most of the officers' questions. Once the right to remain silent has been waived, it can be invoked only by a defendant's positive assertion that he wants to remain silent. [Citation.] Defendant did not tell the detectives that he wanted to remain silent. The Doyle rule, therefore, does not apply in this instance. [Citation.]" Patterson, 217 Ill. 2d at 445.

Likewise here, the State's eliciting testimony regarding defendant's silence in response to some of the questions asked during the interview, after defendant expressly waived his right to remain silent, cannot equate to a Doyle violation.

Indeed, the rationale behind the rule in Doyle is that it would be incongruous to penalize a defendant for invoking his right to silence in response to warnings informing him of his right to silence. Thus, the thrust of the rule in Doyle is that a defendant should not be penalized for his silence where Miranda warnings induced it. Cf. Anderson v. Charles, 447 U.S. 404, 408, 65 L. Ed. 2d 222, 226, 100 S. Ct. 2180, 2182 (1980) (no Doyle violation where questioning made "no unfair use of silence, because a defendant who voluntarily speaks after receiving Miranda warnings has not been induced to remain silent"); Jenkins v. Anderson, 447 U.S. 231, 241, 65 L. Ed. 2d 86, 96, 100 S. Ct. 2124, 2130 (1980) (no Doyle violation, because "no governmental action induced petitioner

to remain silent before arrest"). Here, defendant's silence was not induced by Miranda warnings but, rather, was induced by a difficult question he received some time after expressly waiving his Miranda rights. Thus, the rationale underlying Doyle does not extend to these circumstances.

Defendant further argues that his mid-interview silence should be construed as a belated invocation of his right to remain silent or as an expression of his intent to curtail the interview. Again, we disagree. Silence alone by definition cannot suffice as the type of "positive assertion" (Patterson, 217 Ill. 2d at 445) of the right to remain silent that is necessary to invoke the right once it has been expressly waived. This is especially true here, where, after defendant's silence, the interview continued for even more questioning before defendant affirmatively stated that he no longer wished to speak with police.

In urging that his silence was sufficient to unambiguously invoke his right to stop the interview, defendant relies on our supreme court's decision in People v. Nielson, 187 Ill. 2d 271 (1999). However, the case is readily distinguishable. In Nielson, the defendant agreed to waive his Miranda rights and speak with police, but, as the interview began, he "became increasingly agitated, until finally he placed his hands over his ears, looked up at the ceiling, and began repeating, 'nah nah nah nah nah' " before "[standing] up and announc[ing] that he was leaving." Nielson, 187 Ill. 2d at 284. The supreme court held that the defendant had clearly indicated his desire to cut off questioning. Nielson, 187 Ill. 2d at 287. The defendant's conduct, which the supreme court noted actually forced the interview to be terminated (Nielson, 187 Ill. 2d at 287), was a forceful, if petulant, positive assertion of the desire to terminate the interview. His covering his ears rendered it impossible for him to hear any questions, his chanting made it impossible for him to answer any questions, and his looking away made it impossible for him to see his questioners. Further, his

standing up and announcing that he was leaving not only physically removed him from his questioners but also was unmistakably inconsistent with a desire to remain under questioning. Thus, the defendant in Nielson invoked his right to terminate the interview by making further questioning impossible and clearly, affirmatively expressing his intent to stop the interview.

Here, on the other hand, defendant sat silent in response to some questions but made no positive assertions of his desire to stop questioning until later in his interview. Nor did defendant take any actions that rendered further discussion impossible, as did the defendant in Nielson. In fact, Bailey's testimony indicated that the interview continued for some time after defendant's silence in response to certain questions. Defendant's selective silence here, without more, contrasts sharply with the forceful termination of the interview effected by the defendant in Nielson. Defendant's silence actually contrasts even with his own affirmative termination of the interview some time later. In short, Nielson is no aid to defendant.

At oral argument, defendant offered a different interpretation of Bailey's testimony that, after defendant responded to a difficult question with silence, there was "further questioning" before defendant explicitly invoked Miranda. He argued that the testimony indicated that defendant was silent throughout the remainder of the interview, because Bailey stated only that there was further questioning, and not that defendant offered further answers in response. Based on this interpretation, defendant argued that his later assertion of his right to remain silent should be deemed retroactive to the moment he fell silent. We decline to adopt defendant's reasoning, for two reasons.

First, we disagree with the inference defendant draws from Bailey's testimony. The most ready implication from Bailey's statement that, "[t]hrough a little further questioning he eventually

asked that we end the interview," is that the interview continued, with defendant providing answers, for some time before defendant invoked Miranda.

Second, and more fundamentally, even if we were to share defendant's interpretation of Bailey's testimony, we would reject defendant's argument that his later explicit invocation of his right to silence should apply retroactively to the moment he stopped talking. As noted above, "[o]nce the right to remain silent has been waived, it can be invoked only by a defendant's positive assertion that he wants to remain silent." Patterson, 217 Ill. 2d at 445. "To avoid difficulties of proof and to provide guidance to officers conducting interrogations," the question of whether a defendant has effectively asserted his Miranda rights is "an objective inquiry." Davis v. United States, 512 U.S. 452, 458-59, 129 L. Ed. 2d 362, 371, 114 S. Ct. 2350, 2355 (1994). This approach stands to reason, because a test that ignores the perspective of a reasonable police officer in the same situation would not coincide with Miranda's purpose of curtailing unduly coercive police interrogation and would provide no standards for police to follow. Cf. Davis, 512 U.S. at 460, 169 L. Ed. 2d at 372, 114 S. Ct. at 2355-56, quoting Michigan v. Mosley, 423 U.S. 96, 102, 46 L. Ed. 2d 313, 320, 96 S. Ct. 321, 326 (1975) ("But when the officers conducting the questioning reasonably do not know whether or not the suspect wants a lawyer, a rule requiring the immediate cessation of questioning 'would transform the Miranda safeguards into wholly irrational obstacles to legitimate police investigative activity,' [citation] because it would needlessly prevent the police from questioning a suspect in the absence of counsel even if the suspect did not wish to have a lawyer present"). Defendant's rule, that a clear invocation of Miranda should be applied retroactively to previous interrogation, would cause the exclusion of evidence adduced in a manner police could not have reasonably known was unconstitutional. Thus, defendant's rule would expand the reach of Miranda beyond its purpose.

(Or, it would expand beyond <u>Miranda</u> the exclusionary mechanism used to enforce <u>Miranda</u> (see <u>Davis</u>, 512 U.S. at 461, 169 L. Ed. 2d at 372, 114 S. Ct. at 2356 ("the courts ensure compliance with the <u>Miranda</u> requirements through the exclusionary rule")).) We cannot adopt such a rule.

Defendant's position is essentially that we can now see in hindsight that, since defendant stopped answering questions and later explicitly invoked <u>Miranda</u>, he had no desire to answer any police questions from the moment he fell silent onward. Even though defendant's silence would appear different in hindsight and when paired with his subsequent invocation of <u>Miranda</u>, we must note that what we can see in hindsight is irrelevant to the question of what police could reasonably determine as the relevant questioning transpired. When defendant was silent in the face of police questioning, but before defendant explicitly invoked his right to silence, police lacked the type of emphatic assertion of defendant's <u>Miranda</u> rights that would put them on notice that questioning should stop. Accordingly, we reject defendant's argument that the State's eliciting testimony regarding his selective silence in response to police questioning constituted a <u>Doyle</u> violation.

Defendant's final argument on appeal is that the trial court erred in imposing consecutive sentences for three of his offenses. In cases in which consecutive sentences are not mandatory (see 730 ILCS 5/5--8--4(a) (West 2004)), "[c]onsecutive sentences should be imposed sparingly." <u>People v. O'Neal</u>, 125 Ill. 2d 291, 298 (1988). Section 5--8--4(b) of the Unified Code of Corrections provides as follows:

> "Except in cases where consecutive sentences are mandated, the court shall impose concurrent sentences unless, having regard to the nature and circumstances of the offense and the history and character of the defendant, it is of the opinion that consecutive sentences are

required to protect the public from further criminal conduct by the defendant, the basis for which the court shall set forth in the record." 730 ILCS 5/5--8--4(b) (West 2004). Because the trial court is in the best position to consider a defendant's credibility, demeanor, general moral character, mentality, social environment, and habits, the trial court's decision to impose consecutive, rather than concurrent, sentences for multiple crimes will not be reversed on appeal absent an abuse of discretion. O'Neal, 125 Ill. 2d at 297-98.

As noted above, the trial court based its decision to impose consecutive sentences on the seriousness of defendant's crimes and criminal history, its belief that consecutive sentences were necessary to protect the public, and its observation that defendant had neither learned from nor shown remorse for his actions.

Defendant notes at least two factors that he believes militate against the trial court's decision to impose consecutive sentences for his crimes. First, defendant notes that his "criminal past did not involve a history of violent offenses." Though defendant is technically correct that his criminal past included no violent offenses, we note that defendant's juvenile record includes an adjudication for battery. See People v. Taylor, 221 Ill. 2d 157, 165-67 (2006) (juvenile adjudications are not criminal). Thus, defendant did have a history of violence to go with his history of consistent recidivism.

Second, defendant urges that the only injuries involved here were a result of the victims falling or "being knocked to the ground," not a result of defendant's assaulting them with "intent to cause injury." However, though there was no direct evidence that defendant's primary intent was to harm the victims here, there was evidence that he struggled with Appino and threw Provenzano to the ground. Parker also suffered injuries to her arm as a direct result of defendant's forcefully seizing

her purse. Thus, there was evidence that the current crimes involved physical violence, even if violence itself was not defendant's objective. These factors, along with the trial court's observations regarding defendant's demeanor, supply ample support for the trial court's decision to impose consecutive sentences for three of defendant's four convictions.

For the reasons given, we affirm the judgment of the circuit court of Winnebago County.

Affirmed.

HUTCHINSON and GROMETER, JJ., concur.