2015 IL App (1st) 130097

No. 1-13-0097

Opinion filed June 25, 2015

Fourth Division

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| | ) | No. 09 C6 62080 |
| v. | ) ) | Honorable |
| JAMES WILLIAMS, | ) | Brian Flaherty, |
| Defendant-Appellant. | ) ) | Judge, presiding. |

_____

JUSTICE COBBS delivered the judgment of the court, with opinion.
Presiding Justice Fitzgerald Smith and Justice Howse concurred in the
judgment and opinion.

**OPINION**

¶ 1     Following a jury trial, defendant James Williams was convicted of aggravated

discharge of a firearm pursuant to section 24-1.2(a)(2) of the Criminal Code of 1961 (the Code)

(720 ILCS 5/24-1.2(a)(2) (West 2008)), and sentenced to seven years in prison. On appeal,

defendant contends that (1) the State did not prove him guilty beyond a reasonable doubt because

he was acting in self-defense when he allegedly committed the offense at issue in the case; (2)

the trial court committed an abuse of discretion in delaying its ruling on his motion *in limine* to

exclude his prior convictions and failing to perform the balancing test required under *People v.*

*Montgomery*, 47 Ill. 2d 510 (1971), to determine their admissibility; (3) his trial counsel was ineffective, thereby depriving him of a fair trial; and (4) the sentencing statutes used in his case are in conflict and should be resolved in his favor.

¶ 2                                                    BACKGROUND

¶ 3      On November 26, 2009, defendant was charged by information with two counts of aggravated discharge of a firearm and one count of reckless discharge of a firearm. Ultimately, the State nol-prossed one count of aggravated discharge of a firearm and one count of reckless discharge of a firearm, and proceeded on the remaining count of aggravated discharge of a firearm. On March 20, 2012, defendant filed a pretrial motion *in limine* in which, *inter alia*, he requested that "the State be barred from any mention of the defendant's past criminal history." The trial court reviewed defendant's motion *in limine* in the presence of both parties. The trial court, noting that "there's been no motion for a *Montgomery* [hearing]," then asked the State whether it intended to use defendant's record at trial. The State responded that it would use defendant's record for the purposes of impeachment if defendant decided to testify. The matter was not revisited until August 2, 2012, following the State's case-in-chief. At that time, the trial court ascertained that defendant would testify. The State informed the trial court of two convictions that it intended to use as impeachment: a 2004 conviction for possession of a controlled substance (PCS) and a 2006 conviction for unlawful use of a weapon by a felon (UUWF). Defense counsel notified the trial court that defendant received probation for his 2004 PCS conviction. The State corrected defense counsel and informed the court that the probation was not successfully completed. The trial court then made the following ruling:

> "[D]oing the balancing that the law requires, the probative value versus the
>
> prejudicial effect, I am not going to allow whether or not it was any violation on the

possession of controlled substance. I will allow the unlawful use of weapon by a felon conviction to be used to impeach the defendant."

Defense counsel then asked that the name of the prior conviction not be used because it was a firearm conviction. The trial court stated:

"I will not allow the felony to be named, but he was convicted of unlawful use of a weapon by a felon. Certainly that will be allowed in, the term by a felon. That will be allowed because that is the charge he was convicted of."

¶ 4    At trial, Dwayne Adams testified that on November 26, 2009, after returning home from work at about 12:25 a.m. he went outside to have a beer. He lived in a townhouse at 13743 South Parnell Avenue in the "Pacesetter community" located in Riverdale, Illinois. He entered his 2004 Ford Taurus, which was parked in his driveway, facing the street, to listen to the radio. While seated, he saw two men walk toward his house, whisper to each other, and then separate. Adams recognized one of the men, Deandre White from the neighborhood, but did not recognize the other. He later identified defendant as the other man.

¶ 5    When the men separated, defendant stayed back and White walked past Adams' car and began looking east and west by moving his head back and forth. Adams felt that something was not right. Adams then saw defendant pull a mask over his head and continue to approach his location by scaling walls. At that point, Adams feared for his life. He locked the doors and tried to hide in the car. Defendant approached the car and tried to open the door and then tapped the driver's window with his gun. In response, Adams started the car and drove forward out of his driveway. Adams heard two gunshots as he pulled out of the driveway and the rear driver's side car window shattered.

¶ 6    Adams then observed White and defendant, who was no longer wearing the mask, run off together and then separate. Adams did not have a cell phone to contact the police and decided to

follow defendant in order to keep track of where defendant was headed in order to inform the police. Adams continued to follow defendant; when defendant looked in Adams' direction, defendant shot at the front passenger door of the car. Defendant turned a corner and ran into a field, and Adams drove around the field to keep track of defendant. Defendant then fell to the ground, put the gun down, and said "Okay, I give." At that point, Riverdale police officer Hubbard arrived.

¶ 7     On cross-examination, Adams admitted to his prior conviction for drug dealing. Defense counsel then led Adams through his interrogation by Officer Hubbard which was conducted at the scene. In his police report, Hubbard indicated that Adams had not told him that defendant and White had been whispering, or that it had been an attempted robbery when he was confronted in his car. Adams did not tell Hubbard that defendant tried to break or tap on his window. Adams had testified that defendant had a mask on; however, none was found on defendant when he was searched. Further, Adams had described defendant as wearing a black and red jacket; however, when defendant was arrested he was wearing all black. Adams had also not told Hubbard that defendant had fallen down and was trying to surrender to Adams. Hubbard only saw defendant running and being chased by Adams.

¶ 8     Officer Hubbard next testified that on November 26, 2009, just after 12:25 a.m., he was on patrol in the Riverdale area. He heard two gunshots and could tell that the gunshots were coming from the Pacesetter community of townhomes, which was about 2 ½ blocks west of his location. Hubbard drove toward the shots and then stopped to listen to see if he could hear a car or anybody yelling or screaming. He radioed in to dispatch regarding possible shots fired in the area. About one minute later, Officer Hubbard heard two more gunshots from the same general area. Approximately 30 seconds later, he saw a man running from the area whom he identified in court as defendant. Defendant was running toward Officer Hubbard and carrying a black object.

About 10 to 15 seconds later, Officer Hubbard observed Adams' Ford Taurus coming from the same direction as defendant and noticed that it appeared to be following defendant. He positioned his squad car between defendant and Adams' car. Officer Hubbard then drew his gun and advised defendant and Adams to freeze and show him their hands. At that point, he radioed to responding officers that he had the subjects at gunpoint.

¶ 9    Adams exited his car and told Officer Hubbard that defendant was shooting at him. Officer Hubbard observed what appeared to be two bullet holes in the rear driver's door and that the rear window was shattered. As he focused on Adams, defendant got up off the ground and ran into the alley. Officer Hubbard then pursued defendant. When he located defendant in the alley, defendant got down on his knees and placed his hands in the air and said, "Don't shoot, don't shoot." Shortly thereafter, Officer Hubbard returned with defendant and Adams identified him as the shooter.

¶ 10    Riverdale police officer Belleview and Officer Nathan Roudez, an evidence technician, arrived to assist Hubbard. Adams identified defendant as the person who had been shooting at him. Hubbard advised Officers Belleview and Roudez that defendant had a black object in his possession before he entered the alley and that he may have tossed it. Belleview recovered a 9-millimeter handgun from the alley and turned it over to Officer Roudez. Adams positively identified the recovered weapon as the gun that defendant used in the shootings. Defendant was transported to the Riverdale police department. Officer Roudez then began processing the scene.

¶ 11    Officer Roudez testified that he observed the semiautomatic firearm, removed the magazine, cleared the chamber, took out the live round, photographed it, and then properly inventoried the recovered items. He also recovered one shell casing in the area, a few inches from the curb, photographed it and placed it in a marked evidence protection box. Officer Roudez then relocated to 13743 Parnell Avenue, where he learned the incident had originated.

There, he recovered three more shell casings from the sidewalk and apron of Adams' driveway. Officer Roudez photographed these casings and placed them in an evidence box; he properly inventoried all of the casings he recovered.

¶ 12    Officer Roudez then went to the police station garage bay to process Adams' Ford Taurus. At the station, he photographed the interior and exterior of the car. Officer Roudez observed that the rear driver's side door had sustained three gunshots, and noted that two of the three did not penetrate through the door. Officer Roudez observed one bullet hole in the front passenger's side door. He traced the bullets' trajectory to below the front seat passenger's seat control. The bullet fragments from the car were properly inventoried, and all of the evidence collected was sent to the Illinois state police crime lab.

¶ 13    Illinois State Police forensic scientist Patricia Wallace, an expert in the area of firearms and firearms identification, testified that she identified the firearm recovered as a high-power nine-millimeter semiautomatic pistol that was in operating condition. She had test-fired the firearm and compared the casings with the casings recovered by Officer Roudez from the scene. Her conclusion, within a reasonable degree of scientific certainty, was that the four shell casings recovered from the two crime scenes were fired from that firearm. Following Wallace's testimony, the State then rested.

¶ 14    Defendant testified on his own behalf that on the evening of November 25, 2009, he accompanied a friend and his friend's girlfriend to the Riverdale neighborhood. He testified that he took his 9-millimeter gun with him for his own protection. When they arrived at the Riverdale area, they encountered Deandre White, whom defendant knew. White asked defendant to accompany him when he confronted a drug dealer. Defendant and White walked down the street to talk with Adams, who was sitting in his car, which was parked in the driveway and facing the street. Defendant remained at the end of the driveway on the sidewalk, while White walked up to

the driver's side window of Adams' car. Defendant stated that he "hear[d] a lot of yelling and [saw] hands moving" and "[n]ext thing you know I hear a car revving its motor. It's flying toward me." Adams then drove out of the driveway and turned left and the front bumper of Adams' car grazed defendant's right knee. As the car approached defendant, he moved out of the way and pulled his gun out and fired shots at the car door because he was "trying to save [himself]."

¶ 15    Defendant further testified that after he shot at Adams' car, White ran away, and defendant ran in the opposite direction of the car. He then noticed Adams driving toward his direction and following him. Adams never drove on the curb or the sidewalk but continued to follow defendant saying that he was "fixing to kill [me]" and "I am fixing to run you over." Defendant was trying to cross the street to get away, but Adams blocked his way. Defendant then went back to the sidewalk and shot at Adams' car two more times to get him to go away. Defendant shot at the bottom of the passenger's door, and defendant explained that he was shooting down basically, "like trying to hit the tire of the door to get him to just move, leave me alone." Defendant then ran across the street into a field. Adams circled the field to keep an eye on him. Defendant fell because he was tired and his leg hurt. He was lying on the ground in the street with his gun in his right hand when Hubbard arrived. He then ran away, down an alley and behind a garage, and then threw away his gun. Defendant was arrested and taken to the Riverdale police department, where he met with Riverdale Detective Tony Padron and was read his *Miranda* rights.

¶ 16    In rebuttal, the State offered a certified statement of conviction which indicated that defendant was convicted of unlawful use of a weapon by a felon under case number 06 C6 60218 on August 14, 2006. The 2006 conviction was entered into evidence.

¶ 17    Following closing arguments, the court conducted a jury instruction conference. During the conference, defense counsel requested that a jury instruction regarding the affirmative

defense of self-defense be given because the use of self-defense was justified in both the first and second incidents. The trial court allowed the instruction indicating that the standard is whether or not there is some evidence to allow the affirmative defense of self-defense in, and although it was close, the standard of some evidence had been met.

¶ 18     The jury then received instructions from the trial judge, which included an admonishment that stated :

> "[e]vidence of defendant's previous conviction of an offense may be considered by you only as it may affect his believability as a witness and must not be considered as evidence of his guilt of the offense with which he is charged."

¶ 19     The jury returned a unanimous verdict finding defendant guilty of aggravated discharge of a firearm, and the trial court sentenced him to seven years in prison.

¶ 20     During the hearing for his motion to reconsider, defense counsel informed the court that defendant was under the impression that he would be serving 50% of his seven-year sentence, since his conviction did not involve bodily harm. The trial court found that because defendant was convicted of aggravated discharge of a firearm, he had to serve 85% of the seven years.

¶ 21     This appeal followed. For the reasons following, we affirm.

¶ 22                              ANALYSIS

¶ 23                     Sufficiency of the Evidence

¶ 24     We first address defendant's contention that the State failed to prove him guilty beyond a reasonable doubt of aggravated discharge of a firearm because the State's case rested upon the contradictory, impeached, and noncredible testimony of Adams. The State responds that the evidence amply supports defendant's conviction and the trier of fact properly rejected his claim of self-defense where defendant's conduct was not justified.

¶ 25    Whether the State has presented sufficient evidence to sustain a conviction is reviewed by determining whether the evidence presented at trial, when viewed in the light most favorable to the State, would allow any rational trier of fact to find that the State had proved every element of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). It is the function of the trier of fact to determine the inferences to be drawn from the evidence, assess the credibility of the witnesses, decide the weight to be given their testimony, and resolve any evidentiary conflicts. *People v. Baugh*, 358 Ill. App. 3d 718, 736 (2005) (citing *People v. Tirado*, 254 Ill. App. 3d 497, 513 (1993)). "We will not substitute our judgment for that of the trier of fact on questions involving the weight to be assigned the evidence or the credibility of witnesses." *Id.* at 736-37 (citing *People v. Campbell*, 146 Ill. 2d 363, 375 (1992)). Further, we note that a criminal conviction will not be set aside on grounds of insufficient evidence unless the proof is so improbable or unsatisfactory that there exists a reasonable doubt of the defendant's guilt. See *People v. Pollock*, 202 Ill. 2d 189, 217 (2002) (citing *People v. Maggette,* 195 Ill. 2d 336, 353 (2001)).

¶ 26    Defendant was charged with aggravated discharge of a firearm and asserted the affirmative defense of self-defense. Accordingly, the jury was instructed that in order to sustain a conviction for aggravated discharge of a firearm the State had to prove that defendant: (1) knowingly discharged a firearm; (2) discharged the firearm in the direction of a vehicle he knew was occupied; and (3) was not justified in using the force which he used. 720 ILCS 5/24-1.2(a)(2) (West 2008).

¶ 27    In this case, we find that the State's evidence was sufficient to find defendant guilty of aggravated discharge of a firearm beyond a reasonable doubt. At trial, Adams testified that around 12:25 a.m. he was sitting in his car, a 2004 gold Ford Taurus, which was parked in the

driveway of his townhome located in Riverdale's Pacesetter community when he observed defendant and White walking toward his car. Defendant pulled a mask over his face, approached the car, tried to open the door and then tapped the driver's window with his gun. In fear of his life, Adams drove off and heard two gunshots as he pulled out of the driveway, which shattered the rear window. Adams followed defendant on 138th Street to keep track of him until police arrived. Defendant then shot at the front passenger door of the car. Defendant continued to run until he eventually fell to the ground and surrendered. At that point, Officer Hubbard arrived.

¶ 28    Officer Hubbard testified consistently with Adams. Just after 12:25 a.m., he heard two gunshots coming from the Pacesetter community. As he drove near Pacesetter, he heard two more gunshots. Soon after, Officer Hubbard observed defendant carrying a black object and running southeast from the corner of 138th Street and Eggleston Avenue as Adams followed behind defendant in his Ford Taurus. He positioned his squad car between defendant and Adams' car. Adams then exited his car and told Officer Hubbard that defendant was shooting at him. He also observed two bullet holes in the rear driver's door of Adams' car, and that Adams' rear window was shattered. As he focused on Adams, defendant got up off the ground and ran into the alley. Officer Hubbard chased defendant through an alley, where defendant eventually surrendered. Officer Hubbard recovered a gun from the alley in which defendant fled. Adams positively identified defendant as the person who had been shooting at him, and identified the recovered weapon as the gun that defendant used to shoot at him.

¶ 29    Defendant testified before the jury that he shot at Adams in self-defense after Adams attempted to run him over with his car; however, the jury nevertheless resolved the conflicting evidence in favor of the State. This was its prerogative in its role as the trier of fact. *People v. Moser*, 356 Ill. App. 3d 900, 911 (2005). The credible and consistent testimony of both Adams and Officer Hubbard established that defendant knowingly discharged a firearm in the direction

of a car which he knew was occupied. Moreover, the testimony from Officer Roudez, who recovered the physical evidence in this case, and forensic scientist Wallace, who linked the firearm found near defendant to the casings in Adams' driveway, further supports the jury's finding of guilt. Viewing the evidence in the light most favorable to the State, we do not find the evidence to be so improbable, unsatisfactory, or unconvincing as to raise a reasonable doubt of defendant's guilt. See *Pollock*, 202 Ill. 2d at 217.

¶ 30 Although we find that the evidence at trial established defendant's guilt beyond a reasonable doubt, he nonetheless contends that his conviction should be vacated because the State's case rested upon the impeached, inconsistent and noncredible testimony of Adams. The State responds that the inconsistencies in Adam's testimony did not distract from his testimony concerning material facts regarding the offense of aggravated discharge of a firearm. We agree with the State.

¶ 31 First, defendant contends that Adams' testimony was inconsistent to that of Officer Hubbard's and therefore his credibility is impeached. Specifically, defendant argues that Adams omitted a number of factual details from his initial statement to Officer Hubbard that he later testified to at trial, including that he observed defendant and White whispering before the men approached his car, he recognized White from the neighborhood, defendant attempted to rob him, he chased defendant hoping to track him for the police, and defendant tried to surrender to him. However, we do not find that these factual details are so critical to Adams' story that their omission indicates that he provided noncredible testimony at trial or, more importantly, provides reasonable doubt that defendant committed the offense of aggravated discharge of a firearm. As detailed above, Adams and Officer Hubbard provided consistent testimony regarding the relevant and material facts of the crime. Moreover, our review of the record reveals that each of the omitted facts that defendant now asserts on appeal was presented to the jury through the

testimony of both Adams and Hubbard. Thus, defendant is essentially asking us to reweigh the evidence presented before the jury and draw our own conclusions, which is not our function as a reviewing court. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 224-25 (2009).

¶ 32     Next, defendant asserts that Adams' version of events is simply too strained to be credible, citing *People v. Coulson*, 13 Ill. 2d 290 (1958), and *People v. Herman*, 407 Ill. App. 3d 688 (2011). Although defendant readily acknowledges that both cases differ factually, he nonetheless relies on *Coulson* to assert that Adams' version of events "'taxe[d] the gullibility of the credulous" (*Coulson*, 13 Ill. 2d at 296) and *Herman* for the specific principle that inconsistencies in a witness's testimony affect the credibility of the testimony as a whole (*Herman*, 407 Ill. App. at 707). However, we find nothing in the record to rebut the jury's finding that Adams' version of events, which again was largely consistent with Officer Hubbard's, was credible. Thus, we find these cases unavailing and defer to the judgment of the jury regarding the plausibility of Adams' testimony.

¶ 33     Accordingly, we find that the State presented sufficient evidence to find defendant guilty of aggravated discharge of a firearm beyond a reasonable doubt and decline defendant's invitation to reweigh the evidence or substitute our judgment for that of the jury in reviewing his claims of insufficiency.

¶ 34                                   Motion *in Limine*

¶ 35     Next, defendant alleges three errors stemming from the trial court's ruling on his motion *in limine*, which included a request that the State be barred from any mention of defendant's past criminal history. Specifically, defendant asserts that (1) the trial court failed to issue a timely ruling on whether his prior conviction would be admissible for impeachment purposes; (2) the trial court abused its discretion in balancing the probative value against the prejudicial impact in

reaching its decision to allow the State to introduce evidence of his prior conviction; and (3) trial counsel was ineffective in failing to request a *Montgomery* hearing prior to trial and for failing to ensure that his prior conviction would not be admitted into evidence. The State responds that the trial court properly ruled on the admissibility of defendant's prior convictions before he testified.

¶ 36    Initially, we note that the State maintains that defendant forfeited these claims because he did not both make specific objections during trial and include them in his posttrial motion. Defendant responds that simply filing the motion *in limine* was sufficient to avoid forfeiture of his claims and any failure to preserve these issues for review should be viewed in the context of waiver. We agree with the State that defendant's claims have been forfeited. It is well settled that alleged errors not objected to at trial and specifically raised in a posttrial motion are deemed forfeited on appeal. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Therefore, to preserve these issues for review, defendant must have made timely objections to the trial court's delay in conducting a *Montgomery* hearing and its ruling on the motion as well as included them in his posttrial motion. Because the record is absent such a showing, these issues have been forfeited.

¶ 37    Nonetheless, defendant alleges that the issue can be reviewed for plain error and/or ineffective assistance of counsel. We first review defendant's claims under the plain error doctrine. The plain error doctrine bypasses forfeiture principles and allows a reviewing court to consider unpreserved error when: (1) the evidence is close, regardless of the seriousness of the error; or (2) the error is serious, regardless of the closeness of the evidence. *People v. Herron*, 215 Ill. 2d 167, 187 (2005). However, before we can determine whether the plain error rule applies, we must first determine whether an error actually occurred. See *People v. Cosby*, 231 Ill. 2d 262, 273 (2008).

¶ 38    First, defendant argues that the trial court erroneously deferred ruling on his motion *in limine* to bar the State from any mention of his past criminal history until after the State's case-

in-chief instead of prior to the commencement of trial. The State responds that the trial court properly ruled on the admissibility of defendant's prior convictions before he chose to testify and, thus, any lateness in the ruling did not impact the critical decision on what theory of defense should be pursued.

¶ 39 Generally, evidentiary motions, such as motions *in limine*, are directed to the trial court's discretion, and reviewing courts will not disturb a trial court's evidentiary ruling absent an abuse of discretion. *People v. Harvey*, 211 Ill. 2d 368, 392 (2004). "An abuse of discretion will be found only where the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." *People v. Hall*, 195 Ill. 2d 1, 20 (2000).

¶ 40 In *People v. Montgomery*, 47 Ill. 2d 510 (1971), our supreme court adopted the then-proposed Federal Rule of Evidence 609 as a guide for trial courts in deciding whether a defendant's prior convictions should be admitted to impeach credibility. *Id.* at 516-17. Under *Montgomery*, evidence of a witness's prior conviction is admissible to attack the witness's credibility when: (1) the prior crime was punishable by death or imprisonment in excess of one year, or involved dishonesty or false statements; (2) less than 10 years have elapsed since the date of conviction of the prior crime or release of the witness from confinement, whichever is later; and (3) the probative value of admitting the prior conviction outweighs the danger of unfair prejudice. *Id.*

¶ 41 The holding in *Montgomery*, however, does not suggest the proper time for ruling on the admissibility of a prior conviction. Noting such omission in *Montgomery*'s holding, our supreme court addressed this issue in *People v. Patrick*, 233 Ill. 2d 62 (2009). In *Patrick*, the court reviewed whether a trial court's delay in ruling on a defendant's motion *in limine* to exclude a prior conviction from use as impeachment until after he testified was an abuse of discretion. *Id.*

at 65. The *Patrick* court acknowledged a defendant's need for an early ruling on the admissibility of a prior conviction and noted that in all but the most complicated cases, a judge will have enough information before trial to conduct a *Montgomery* test. *Id.* at 73. The court reasoned:

> "When applying the Montgomery rule before trial, a trial judge will certainly be able to determine whether the prior crime was punishable by death or imprisonment in excess of one year, or involved dishonesty or false statements. Likewise, a trial judge can readily ascertain whether less than 10 years has elapsed since the date of conviction of the prior crime or release of the witness from confinement. Moreover, in all but the most complicated cases, a judge will have enough information before trial to weigh the probative value of admitting the prior conviction against the danger of unfair prejudice to the defendant." *Id.*

¶ 42    Ultimately, the *Patrick* court concluded that "a trial court's failure to rule on a motion *in limine* on the admissibility of prior convictions when it has sufficient information to make a ruling constitutes an abuse of discretion." *Id.*

¶ 43    In this case, the trial court did not abuse its discretion in delaying its ruling on defendant's motion *in limine*. Defendant's motion *in limine* makes no mention of the specific prior criminal convictions that he wished to bar the State from mentioning at trial. Additionally, a review of the record reveals that at the pretrial conference, where the court initially reviewed the motion, no Montgomery motion had been filed nor did either party attempt to inform the court of the prior convictions at issue in this case. It is clear that the trial court did not have sufficient information before it to conduct the test enunciated in *Montgomery* at this point in the proceedings. Therefore, it was not an abuse of discretion for the trial court to delay its ruling on the motion *in limine* until it was properly informed of defendant's prior convictions.

¶ 44    Nonetheless, defendant, citing *Patrick*, argues that the delay in the trial court's ruling deprived him of any ample opportunity to carefully consider whether or not to testify in light of the ruling and robbed his counsel of any chance to formulate a strategy. We disagree and find the factors which the *Patrick* court found amounted to reversible error wholly absent in the instant case. First, the trial court in *Patrick* had a "blanket policy" of refusing to rule on all motions *in limine* on the admissibility of prior convictions until after a defendant's testimony, making its decision "arbitrary and without reason." *Id.* at 74-75. Next, the trial court in *Patrick* deferred ruling on the defendant's motion until *after* he testified, forcing the defendant to "make a tactical decision without the ability to evaluate the impact it would have on his defense." *Id.* at 75.

¶ 45    Here, the trial court justifiably delayed ruling on defendant's motion until it ascertained that defendant would testify and it was properly informed of defendant's prior convictions. Further, the danger of prejudice articulated by *Patrick* is not present in this case because the trial court ruled on defendant's motion before defendant took the stand to testify, giving him an opportunity to make a tactical decision to testify with all of the relevant information before him. See *id.* at 74 (holding that a defendant is at least entitled to have the trial judge determine, before the defendant testified if possible, whether any of the convictions would be excluded as a matter of law). Moreover, we agree with the State that, unlike the defendant in *Patrick*, the record reveals that defense counsel was aware that defendant would testify regardless of whether the trial court ruled to admit his prior conviction, as he alleged self-defense and his testimony was the only evidence supporting this theory. Therefore, we find no support for defendant's contention that he was in any way prejudiced by the timing of the trial court's ruling on whether to admit his prior conviction for purposes of impeachment.

¶ 46    Next, defendant contends that the trial court abused its discretion in failing to perform the balancing test required by *Montgomery* when it allowed the State to introduce his prior UUWF

conviction for impeachment purposes. The State maintains that the trial court exercised its sound discretion and properly allowed admission of defendant's prior UUWF conviction for impeachment because it was probative of his credibility.

¶ 47    The determination of whether a witness's prior conviction is admissible for purposes of impeachment is within the sound discretion of the trial court, and its ruling may not be reversed absent a clear abuse of discretion. *People v. Atkinson*, 186 Ill. 2d 450, 456, 461 (1999).

¶ 48    Evidence regarding other crimes is inadmissible to demonstrate propensity to commit the charged crime. *People v. Williams*, 161 Ill. 2d 1, 39 (1994). The last factor of the *Montgomery* test requires the trial judge to conduct a balancing test, weighing the prior conviction's probative value against its potential prejudice. *People v. Mullins*, 242 Ill. 2d 1, 14-15 (2011). If the prejudice to defendant substantially outweighs the probative value of admitting the impeachment evidence, then the evidence must be excluded. *Id.* at 15. The trial court is given wide latitude in determining whether the probative value of admitting a particular conviction outweighs any unfair prejudice to defendant. *People v. Tribett*, 98 Ill. App. 3d 663, 675 (1981). However, when the admission of improper other crimes evidence violates the defendant's right to a fair trial, the reviewing court must reverse and remand the case for a new trial. *People v. Hope*, 116 Ill. 2d 265, 275 (1986).

¶ 49    In this case, the trial court properly exercised its discretion in admitting defendant's prior conviction for UUWF for impeachment purposes. At trial, the State attempted to admit both defendant's 2004 PCS and 2006 UUWF convictions for purposes of impeachment. In reaching its decision to exclude the PCS conviction and allow the UUWF conviction, the trial court, explicitly stated that it was "doing the balancing that the law requires" and specifically focused on "the probative value versus the prejudicial effect" of admitting each conviction. In light of the trial court's comments, we cannot accept defendant's contention that the court failed to weigh the

probative value of admitting his prior convictions as impeachment evidence against its possible prejudicial effect. It is clear that the court applied conscientious judgment and did not act arbitrarily in making its decision; we therefore find that the trial court conducted a proper balancing test and thereby adhered to the *Montgomery* rule.

¶ 50    Nevertheless, defendant maintains that it was prejudicial to disclose his previous firearm related conviction because when a prior conviction is similar to the offense for which a defendant is being tried, evidence of similar offenses creates pressure for the jury to believe that "if he did it before he probably did so this time." However, we note that although "[c]onvictions for the same crime for which the defendant is on trial should be admitted sparingly" (*People v. Cox*, 195 Ill. 2d 378, 384 (2001) (citing *Williams*, 161 Ill. 2d at 38)), a court is not barred from admitting the same or similar prior convictions for impeachment purposes (*People v. Barner*, 374 Ill. App. 3d 963, 971 (2007)). Further, our supreme court has acknowledged that where the defendant's testimony makes up his entire defense, as it did here, his credibility is a central issue and admission of prior convictions is crucial in measuring the defendant's credibility. See *Atkinson*, 186 Ill. 2d at 462 (citing *People v. Williams,* 173 Ill. 2d 48, 83 (1996) (holding that the trial court did not abuse its discretion in denying the defendant's motion to bar the State from impeaching the defendant's credibility with evidence of his prior conviction for aggravated battery where the defendant was on trial for murder and aggravated battery with a firearm)).Thus, we cannot say the trial court's decision to admit the UUWF amounted to an abuse of discretion, as it was not unreasonable for the court to find that the conviction was probative of defendant's credibility in this case.

¶ 51    We agree with defendant that the trial court's response to defense counsel's request that the UUWF felony not be named was certainly confusing. Specifically, the court stated that it "would not allow the felony to be named but he was convicted of unlawful use of weapon by a

felon. Certainly that will be allowed in, the term by a felon." However, we do not find that allowing the State to enter the name of the prior conviction was error, as it accurately informed the jury of the nature of the prior crime. See *Id.* at 458 (noting that "[o]ur case law interpreting *Montgomery* suggests that it is the nature of a past conviction, not merely the fact of it, that aids the jury in assessing a witness' credibility").

¶ 52    Moreover, we believe the State's reliance on *Barner* is on point. In *Barner*, our supreme court held that "[t]he prejudicial effect of admitting similar or identical offenses is diminished where *** the jury receives a limiting instruction on its use of the earlier conviction." *Barner*, 374 Ill. App. 3d at 972 (citing *Atkinson*, 186 Ill. 2d at 463). Here, the trial court strictly limited the use of the prior conviction by providing the jury with an instruction limiting its evidentiary use to impeachment. Specifically, the trial court instructed the jury to consider defendant's prior aggravated discharge of a firearm conviction only for the purpose of assessing defendant's credibility as a witness, and not as evidence of his guilt of the offense charged. The jury is presumed to follow the instruction that the court gives it. See *People v. Glasper*, 234 Ill. 2d 173, 201 (2009) (quoting *People v. Taylor,* 166 Ill. 2d 414, 438 (1995)). Accordingly, any prejudice that defendant could have possibly faced by the court's decision to allow the UUWF conviction as impeachment evidence was cured by the instruction.

¶ 53    Finally, defendant contends that the trial court's errors were exacerbated by his trial counsel's performance. Specifically, he alleges that his counsel was ineffective because counsel was not informed on the status of his prior convictions, so as to enable himself to make a cogent argument urging that they be excluded, and did not know the law applicable to impeachment using prior convictions, so that he could adequately advance his arguments. The State responds that in light of the overwhelming evidence of guilt, the fact that the trial court did not allow the certified copy of the conviction to be sent to the jury during deliberations and that the jury was

properly instructed on the weight to be given to the prior conviction, defendant was not prejudiced by any error that may have occurred regarding the admission of his prior conviction into evidence for impeachment purposes.

¶ 54    In general, the standard of review for determining if an individual's constitutional rights have been violated is *de novo. People v. Burns*, 209 Ill. 2d 551, 560 (2004). Both the United States and Illinois Constitutions guarantee criminal defendants the right to the effective assistance of counsel. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8; *Strickland v. Washington*, 466 U.S. 668, 685-86 (1984).

¶ 55    A claim of ineffective assistance of counsel is evaluated under the two-prong test set forth in *Strickland* (*id.* at 687). Under the test, a defendant must demonstrate that counsel's performance fell below an objective standard of reasonableness and a reasonable probability exists that, but for counsel's unprofessional errors, the result of the proceedings would have been different.  *People v. Ramsey*, 239 Ill. 2d 342, 433 (2010). A defendant's failure to establish either prong of the *Strickland* test precludes a finding of ineffective assistance of counsel. *People v. Patterson*, 217 Ill. 2d 407, 438 (2005). Thus, we need not determine whether counsel's performance was actually deficient if we determine defendant suffered no prejudice as a result of counsel's alleged deficiencies. *People v. Edwards*, 195 Ill. 2d 142, 163 (2001).

¶ 56    We do not find that counsel was ineffective in this case because there is no reasonable probability that the result of the proceedings would have been different. Although defense failed to accurately inform the court of defendant's prior convictions or request a *Montgomery* hearing prior to trial, we find that defendant has failed to show a reasonable probability that counsel's shortcomings prejudiced him. See *People v. Melton*, 2013 IL App (1st) 060039, ¶ 35 (noting that "[m]istakes in strategy or tactics alone do not normally amount to ineffective assistance of counsel"). As noted above, after the court ascertained that defendant would testify, the State

accurately informed the court of defendant's prior convictions. The court then properly performed the *Montgomery* balancing test prior to defendant's testimony, allowing the State to admit the UUWF conviction as impeachment evidence following his testimony. Moreover, as a safeguard against the potential for improper use of the conviction, the trial court instructed the jury that it could only consider the prior conviction for purposes of determining defendant's credibility, and not as evidence of his guilt of the offense. Thus, even if we could say that counsel's performance fell below an objective standard of reasonableness, defendant has not met the second prong of the *Strickland* test because he has not proved that a reasonable probability exists that, but for counsel's unprofessional errors, the result of the proceedings would have been different. See *Strickland*, 466 U.S. at 694 (explaining that a reasonable probability is a probability sufficient to undermine the confidence in the outcome).

¶ 57    Accordingly, because we find no merit to any of defendant's alleged trial errors, there can be no plain error. Therefore, his claim must fail.

¶ 58                                    Sentencing Statutes

¶ 59    We next consider defendant's final contention that a sentencing conflict exists as to what amount of credit for time served defendant should receive and that the conflict should be resolved so that he receives day-for-day credit on his sentence. First, the State maintains that defendant forfeited this issue as he failed to preserve it below. Defendant responds that a challenge to a void order is not subject to forfeiture. See *People v. Marshall*, 242 Ill. 2d 285, 302 (2011); see also *People v. Wilder*, 325 Ill. App. 3d 987, 996 (2001) (acknowledging that "the imposition of a sentence not authorized by the statute is void and it may be challenged at any time").

¶ 60    Defendant's voidness claim requires for its disposition that we engage in statutory interpretation, which we review *de novo*. *People v. Marshall*, 242 Ill. 2d 285, 292 (2011). We

begin our analysis with the following settled principles in mind. The fundamental objective of statutory construction is to ascertain and give effect to the intent of the legislature, presuming it did not intend to cause absurd, inconvenient, or unjust results. *People v. Lewis*, 234 Ill. 2d 32, 44 (2009) (citing *People v. Christopherson*, 231 Ill. 2d 449, 454 (2008)). A statute is considered in its entirety, keeping in mind the subject addressed and the legislature's apparent objective in enacting it. *Id.* (citing *People v. Cardamone*, 232 Ill. 2d 504, 512 (2009)). The best indication of legislative intent is the language of the statute, given its plain and ordinary meaning. *Abruzzo v. City of Park Ridge*, 231 Ill. 2d 324, 332 (2008). In giving effect to legislative intent, the court should consider, in addition to the statutory language, the reason for the law, the problems to be remedied, and the objects and purposes sought. *People v. Haywood*, 118 Ill. 2d 263, 271 (1987).

¶ 61    Section 3-6-3(a)(2) of the Unified Code of Corrections (Unified Code) provides in relevant part:

"(2) The rules and regulations on early release shall provide, with respect to offenses listed in clause (i), (ii), or (iii) of this paragraph (2) committed on or after June 19, 1998 or with respect to the offense listed in clause (iv) of this paragraph (2) committed on or after June 23, 2005 (the effective date of Public Act 94-71) ***, the following:

* * *

(iii) that a prisoner serving a sentence for *** aggravated discharge of a firearm *** when the court has made and entered a finding, pursuant to subsection (c-1) of Section 5-4-1 of this Code, that the conduct leading to conviction *** resulted in great bodily harm to a victim, shall receive no more

than 4.5 days of good conduct credit for each month of his or her sentence of imprisonment;

(iv) that a prisoner serving a sentence for aggravated discharge of a firearm, whether or not the conduct leading to conviction for the offense resulted in great bodily harm to the victim, shall receive no more than 4.5 days of good conduct credit for each month of his or her sentence of imprisonment[]" 730 ILCS 5/3-6-3(a)(2) (West 2008).

¶ 62    Defendant maintains that because he committed the instant offense after June 23, 2005, both subsections (a)(2)(iii) and (a)(2)(iv) of section 3-6-3 of the Unified Code applied to his sentence for aggravated discharge of a firearm. Specifically, he argues that because subsection (a)(2)(iii) required a defendant to serve 85% of his sentence for the offense of aggravated discharge of a firearm (committed on or after June 19, 1998) only when a trial court has entered a finding of "great bodily harm," whereas subsection (a)(2)(iv) required a defendant to serve 85% of his sentence for the same offense (committed on or after June 23, 2005) regardless of whether the trial court made a finding of "great bodily harm," the two provisions directly contradicted each other. Defendant contends that because the trial court did not make a finding of "great bodily harm" in this case, pursuant to the rule of lenity, which allows ambiguous statutes to be construed in favor of the accused, the provision that operated in his favor (subsection (a)(2)(iii)) should have been applied and that the trial court erred in ordering him to serve 85% of his sentence for aggravated discharge of a firearm. We disagree.

¶ 63    Here, defendant committed the offense of aggravated discharge of a firearm on November 26, 2009, which only triggered the application of subsection (a)(2)(iv). The victim suffered no physical injury. The plain language of subsection (a)(2)(iv) reveals the legislature's intent that a defendant who commits the offense of aggravated discharge of a firearm *after* June

23, 2005 must serve at least 85% of his sentence regardless of whether the conduct resulted in "great bodily harm" to a victim. Clear from the language in subsection (a)(2)(iv) is that the legislature deemed this offense to be of such a serious nature, that it sought to enhance the time served provision regardless of bodily harm to a victim. Accordingly, we find no ambiguity in the statute, and defendant's voidness argument fails, as does his claim for application of the rule of lenity.

¶ 64                                   CONCLUSION

¶ 65        Accordingly, based on the record, it is our considered judgment that defendant was proved guilty beyond a reasonable doubt. Additionally, we conclude that the trial court properly applied the sentencing statute. For the foregoing reasons, the trial court is affirmed.

¶ 66        Affirmed.