NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2026 IL App (4th) 241092-U

NO. 4-24-1092

IN THE APPELLATE COURT

FILED
January 16, 2026
Carla Bender
4th District Appellate
Court, IL

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Ogle County |
| MATTHEW T. PLOTE, | ) | No. 22CF56 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | John B. Roe IV, |
| | ) | Judge Presiding. |

JUSTICE ZENOFF delivered the judgment of the court.
Justices Lannerd and Grischow concurred in the judgment.

**ORDER**

¶ 1    *Held*: The appellate court affirmed defendant's convictions for first degree murder, intentional homicide of an unborn child, and residential arson, where the trial court did not abuse its discretion in (1) allowing the jury to watch a four-hour video recording of defendant's police interrogation, (2) prohibiting defense counsel from impeaching a police officer with his grand jury testimony, and (3) allowing defendant's coworkers to testify. Additionally, because the court committed no error, there could be no cumulative error.

¶ 2    Defendant, Matthew T. Plote, was charged with first degree murder of Melissa Lamesch, the mother of his unborn child (720 ILCS 5/9-1(a)(1), (2) (West 2020)), intentional homicide of his unborn child (720 ILCS 5/9-1.2(a)(1), (2) (West 2020)), residential arson (720 ILCS 5/20-1(b) (West 2020)), aggravated domestic battery (720 ILCS 5/12-3.3(a-5) (West 2020)), and concealment of a homicidal death (720 ILCS 5/9-3.4(a) (West 2020)). Following a trial, the jury found defendant guilty of all charges. After determining that the aggravated domestic battery conviction merged with the first degree murder conviction and the concealment of a homicidal

death conviction merged with the residential arson conviction, the trial court sentenced defendant to concurrent prison terms of life for first degree murder, 60 years for intentional homicide of an unborn child, and 15 years for residential arson. Defendant appeals, arguing that (1) the court erred in allowing the State to play a four-hour video of his police interrogation, (2) the court improperly prohibited his counsel from impeaching a police officer with his grand jury testimony, (3) the testimony of his coworkers was more prejudicial than probative, and (4) "the cumulative effect of multiple errors deprived [him] of a fair trial." For the reasons that follow, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4          On November 25, 2020, Melissa was living with her father, Gustave Lamesch, at his home on South Hannah Avenue in Mount Morris, Illinois. Melissa was pregnant and scheduled to be induced two days later. At approximately 4:30 p.m., a neighbor noticed smoke coming from the Lamesches' house and called 911. Firefighters found Melissa dead on the floor in the kitchen. That evening, police interviewed defendant. On August 28, 2021, police interviewed defendant again, this time for more than seven hours.

¶ 5          On March 8, 2022, the State presented evidence and testimony to the grand jury, seeking an indictment against defendant. Lieutenant Brian Ketter of the Ogle County Sheriff's Office testified before the grand jury that he investigated Melissa's death. As part of his investigation, he learned that Melissa's sister, Cassandra Baal, called Melissa "around 10:00" a.m. on November 25, 2020, and talked to her for "two hours and 22 minutes." Ketter testified: "Towards the end of the call, Melissa told Cassandra, 'Matthew's here. He needs to stop doing this.' " During the course of his investigation, Ketter learned that "Matthew" was defendant. The grand jury issued a 10-count indictment against defendant, charging him with 4 counts of first degree murder (counts I through IV), 3 counts of intentional homicide of an unborn child (counts

V through VII), and 1 count each of residential arson (count VIII), aggravated domestic battery (count IX), and concealment of a homicidal death (count X).

¶ 6    On November 17, 2023, defendant filed a motion *in limine*, requesting the trial court prohibit the State from "introducing any evidence of [his] silence" during the August 28, 2021, interrogation. The State filed a response to the motion, explaining that it did not intend to play portions of the interrogation during which defendant did "not actively participate" but asserting that the remainder of the interview, including defendant's silence, was "relevant." On March 7, 2024, the court entered an order denying defendant's motion *in limine*. The court reasoned that defendant's failure to explicitly and unambiguously invoke his right to remain silent during the interrogation constituted a waiver of that right.

¶ 7    Defendant's jury trial took place over five days in March 2024. The evidence at trial revealed the following. In October 2020, Melissa moved in with her father. Troy Clayton, who lived directly across the street from the Lamesches, testified that "some time around 1:30" p.m. on November 25, 2020, he saw "a white male in his mid 20's, early 30's walking down the street" wearing a hat and a "blue Armorall [*sic*] backpack." The man walked "right up the driveway and knocked on the front door" of the Lamesches' house. Clayton "watched Melissa open the door and let him in." Clayton had never seen the man before and denied seeing anyone else he did not recognize in the neighborhood that day. Clayton denied seeing any cars he was not familiar with parked on Hannah Street on November 25, 2020.

¶ 8    Another neighbor noticed smoke coming from the Lamesch home at approximately 4:30 p.m. and called 911. Firefighters from the Mount Morris Fire Protection District quickly responded to the fire. When they arrived, they saw a great deal of smoke coming from the roof of the home. All windows and doors to the Lamesch home were locked when firefighters arrived.

Firefighters forced open the front door and located Melissa on the floor in front of the refrigerator with debris on top of her.

¶ 9 Gustave testified that Melissa moved in with him in October 2020 to save money in preparation for the birth of her baby. Melissa did not tell him who the baby's father was, and Gustave had neither met nor spoken to defendant. Gustave did not notice anything missing from his house after the fire.

¶ 10 Two forensic pathologists performed autopsies on Melissa: Dr. Mark Peters and Dr. Amanda Youmans. They both concluded that Melissa's cause of death was "strangulation." They both also identified many predeath bruises on Melissa's legs and thighs, as well as contusions on her scalp caused by "impacts" or "blows" to her head. The pathologists also found contusions and abrasions in Melissa's vagina, which Peters thought could be consistent with "vaginal sexual intercourse." However, Youmans believed those injuries were "consistent with sexual assault," rather than "consensual sex."

¶ 11 Both Peters and Youmans determined that Melissa was not alive when the fire started because she had no soot in her lungs and a normal level of carbon monoxide in her blood. Both pathologists testified that Melissa was pregnant with a healthy, full-term male fetus at the time of her death. Youmans testified that the fetus died shortly after Melissa when blood stopped flowing to the umbilical cord.

¶ 12 A sexual assault kit was prepared, with swabs taken from Melissa's vagina and anus. Fingernail scrapings were also taken from both of Melissa's hands.

¶ 13 Chad Gallick, a detective with the Ogle County Sheriff's Office, testified that he met with defendant on November 25, 2020, at the Rochelle Police Department. Gallick interviewed defendant, and that recorded interview was played for the jury. During that interview,

defendant said he worked as a paramedic for the Carol Stream Fire Protection District but "called off" work that day because he hurt his knee while running the day before. He did not see a medical professional for the injury but "did the RICE thing," which is "rest, ice, compression, elevation." He said he was not in a dating relationship with Melissa but had sex with her from time to time. Melissa told him she was pregnant in April or May. At that time, defendant asked Melissa about having an abortion, but she said "no." After that, he and Melissa did not talk for a while. He said that after talking to his parents, he decided he wanted to be involved with the child.

¶ 14　　　Defendant told Gallick that he drove from his house in Malta, Illinois, to Melissa's house in Mount Morris on November 25, 2020. He did not tell Melissa he was coming. He said he parked on the street in front of her house. He estimated that he arrived at Melissa's house "around 1:00" after leaving his house "around noon." He and Melissa talked about finances related to the child and then had sex. He said he was at Melissa's house for "not more than an hour." He said he left through the front door and drove home. After that, he went to Resource Bank in Malta, and then to the Malta fire station.

¶ 15　　　According to Gallick, defendant had no "affect" during the interview and no reaction when Gallick told him Melissa was deceased. Gallick testified that defendant never asked him about "the baby."

¶ 16　　　Michael Poel, a fire marshal, was tendered by the State and accepted by the trial court as an "expert in the field of arson investigation." He testified that the fire in the Lamesch home began in the kitchen, specifically, in the cabinets above the stove. He determined that the fire "was most likely incendiary in nature, which means it was a fire that was intentionally set."

¶ 17　　　Baal, Melissa's sister, testified that she called Melissa on November 25, 2020, at 10:50 a.m. and talked to her for "almost two and-a-half hours." Toward the end of that

conversation, Melissa told Baal, "Matt's here, he's got to stop doing this." Melissa told Baal "she'd make the conversation quick and she would call [Baal] right back." Melissa never called Baal back.

¶ 18    Before the next two witnesses testified, defense counsel objected, arguing that their testimony would be prejudicial and "an attempt to attack [defendant's] character." The trial court overruled the objection.

¶ 19    Josh Conlon, a firefighter/paramedic with the Carol Stream Fire Protection District, testified that he began working with defendant in March 2020. Conlon testified that he and defendant did not share details about their lives with each other very often. Defendant never mentioned Melissa or told him he was going to be a father. Conlon worked with defendant on November 28, 2020. On that day, defendant did not mention anything that happened on November 25, 2020. Conlon "got Covid" between November 28 and December 1, 2020, and everyone he worked with, including defendant, "got quarantined for two weeks" and could not work. Conlin described defendant as "pretty reserved" with everyone at work.

¶ 20    Jason Kanzia, a lieutenant with the Carol Stream Fire Protection District, testified that defendant was assigned to his fire station on November 28, 2020. Kanzia did not notice "anything out of the ordinary" with defendant that day. Defendant did not talk to Kanzia about Melissa, a baby, or anyone he knew being involved in a fire. Kanzia testified that he and defendant never talked to each other about their personal lives.

¶ 21    Blake Aper was tendered by the State and accepted by the trial court as an expert in forensic biology and DNA. He testified that he reviewed the results of the sexual assault kit, compared them to defendant's DNA, and determined that defendant "could not be excluded from contributing to the male profile that was found on the vaginal swabs and anal swabs." Aper

explained that "[t]he male profile *** from which [defendant] could not be excluded would be expected to be found in 1 in 43 octillion unrelated individuals." Aper explained that an octillion has 28 zeros behind it, while a billion has 9 zeros. He further explained that the population of Earth is "about eight billion," so to find someone else with a profile consistent with the profile found on the vaginal swab, he would have to sample more than the number of people on Earth.

¶ 22　　　　Aper also analyzed fingernail scrapings collected from Melissa's hands and found "a male DNA profile" in the scrapings from each hand. Aper testified that defendant "could not be excluded from contributing to that male profile." Aper determined that "the male profile from the right hand fingernail scrapings would be expected to be found in one in 270 sextillion unrelated individuals," and the male profile on the left hand fingernail scrapings "would be expected to occur in one in 19 quadrillion individuals." Aper testified that a sextillion has "18 zeros" behind it and a quadrillion has "15." Aper found no unknown DNA on the vaginal swab, anal swab, or fingernail scrapings taken from Melissa. The parties stipulated that, based on DNA testing, defendant was the father of Melissa's unborn baby.

¶ 23　　　　Brian Ketter, who retired from the Ogle County Sheriff's Office shortly before the trial, testified that he was in charge of the investigation into Melissa's death. He received a video recording from Resource Bank located in Malta, Illinois, showing defendant there at 5:20 p.m. on November 25, 2020.

¶ 24　　　　Ketter testified that in the early morning of August 28, 2021, he and Gallick performed a traffic stop on defendant and took him into custody. On the way to the police station, Ketter provided defendant with a form notifying him of his *Miranda* rights (see *Miranda v. Arizona*, 384 U.S. 436 (1966)), which defendant signed, indicating his understanding of those rights. When they reached the station, Ketter took defendant to an interview room, where Ketter,

Gallick, and Chief Jason White of the Mount Morris Police Department interviewed defendant together and separately for a little over seven hours. That interview was video recorded. The State presented as an exhibit a four-hour edited version of the interview, removing "empty" portions. Over defendant's objection, the trial court admitted the four-hour version of the video and played it for the jury.

¶ 25    The video-recorded interrogation began at 6:28 a.m., with defendant discussing with Ketter and Gallick what he did on November 25, 2020. He said he left his house in Malta at "around noon" and arrived at Melissa's house in Mount Morris about "45 minutes or so later." He said he was not carrying anything with him but was wearing a Chicago Bears hat, which he purposely left at Melissa's house. He said he and Melissa talked about finances and then had sex on the couch. He estimated he was at Melissa's house for "an hour-and-a-half to two hours." He said Melissa complained about cramping while he was there.

¶ 26    Defendant said that when Melissa first told him she was pregnant, he was "shocked" and "could have been more supportive." He said he "didn't talk to her for a while" after that. Melissa told his parents she was pregnant, and "[t]hey were hurt that [he] wasn't the one that told them." Defendant did not tell anyone that Melissa was pregnant, including his coworkers. When Ketter asked defendant how he had been since Melissa's death, defendant said, "I was pretty shaken up. I had two weeks off work—time to kind of grieve or whatever you do. I had to go back to work and fake it 'til you make it." When Ketter asked defendant what he thought happened to Melissa, he said, "I don't know. I know a couple months prior she had a fainting thing. I don't know if something like that happened." The questioning stopped at 7:04 a.m. and resumed at 7:16 a.m.

¶ 27    When the questioning resumed, Ketter explained that he and other officers had been

working on Melissa's case for nine months and knew "there's more that happened that day at the house with you and Melissa." Ketter then explained that he needed "the whole story" from defendant and asked defendant, "So what else happened?" Defendant responded, "I don't understand." Ketter asked defendant, "What's the rest of the story?" Defendant responded, "There is no story." After that, Ketter said, "Tell us what happened in the house." Defendant responded, "I already told you what happened in the house." Ketter then stated, "There's more that happened" and asked, "What happened?" Defendant responded, "I don't know how to answer your question."

¶ 28     Defendant denied having "rough sex" with Melissa. When Ketter explained that he was trying to find reasons for Melissa's injuries, defendant said, "She talked about the cramping she had. I'm kind of at a loss for what you're looking for and how I can help you." Ketter said, "So tell us the rest of the story." Defendant responded, "I told you." Ketter told defendant that he believed that "whatever [he] did in the house" is "the reason Melissa is no longer with us." Ketter said the following "facts" supported that defendant was not being completely forthcoming: "You said you parked in front of her house but a neighbor said you walked down the street. *** You parked up the street so no one would see you. You showed up unannounced. The neighbor said you were wearing a drawstring Under Armour backpack." Ketter asked, "What was in the backpack?" Defendant responded, "I don't know."

¶ 29     From 7:44 to 7:49 a.m., Ketter asked defendant what happened, and defendant remained silent. At 7:50 a.m., Gallick asked defendant, "Did you drive over there with the intention of killing her?" Defendant responded, "No, I didn't go anywhere with the intention of killing anybody." At 7:56 a.m., Gallick discussed how couples sometimes have arguments or disagreements that start as "a verbal domestic," then become "physical, and in some cases

somebody ends up dying as a result." The video stopped at 7:57 a.m. and restarted at 8:26 a.m., with Chief White and Ketter present with defendant.

¶ 30  At 8:27 a.m., Ketter asked defendant, "Did you intend to kill [Melissa]?" Defendant responded, "I had no intention of hurting Melissa." The video stopped at 8:28 a.m. and restarted at 8:44 a.m., with Ketter and Gallick present with defendant. At that time, Ketter showed defendant the autopsy photo of his unborn child and said, "That's your child." The video stopped at 8:47 a.m. and started again at 9:07 a.m. At that time, Gallick asked defendant, "Are you sorry you went to the house that day?" Defendant responded, "Yes, I'm sorry I went to the house that day." Ketter later asked defendant, "Are you sorry for what you did inside the house?" Defendant asked, "What I did in the house?" Ketter replied, "You tell us what you did in the house." Defendant remained silent. At 9:12 a.m., White stated: "Tell your side, Matt. Otherwise, people are going to think that this guy went over with the intention of *** committing a heinous crime, having sex with a corpse, doing whatever and leaving with no remorse." Defendant did not respond. Ketter then asked, "Was Melissa alive when you guys had sex?" Defendant responded, "Of course she was." When Ketter asked defendant what happened after that, defendant remained silent. The video stopped at 9:18 a.m. and restarted at 10:48 a.m., with Ketter, Gallick and defendant present.

¶ 31  At 10:49 a.m., defendant denied that he drove to Melissa's house "to kill her intentionally." After that, there was a discussion about the unborn child. At 10:58 a.m., defendant again said he did not "plan to hurt [Melissa]." Gallick then asked, "Did you accidentally kill Melissa?" Defendant did not respond. Between 11:03 and 11:12 a.m., defendant remained silent while Gallick and Ketter asked if he accidentally killed Melissa. At 11:16 a.m., defendant stated, "I said I never wanted to hurt her." From 11:19 to 11:21 a.m., both officers asked defendant if he had an argument with Melissa. Defendant did not answer those questions. Instead, he stated, "Your

paper said I had a right to not say anything." Ketter responded, "You are correct." Ketter continued questioning defendant.

¶ 32 Ketter asked if Melissa was "an evil person." Defendant responded, "Melissa was not an evil person." Gallick asked defendant why he "strangled" and "choked" Melissa. Defendant remained silent. Ketter showed defendant Melissa's autopsy photo and asked, "Why did you do it?" Defendant did not respond. Gallick asked defendant, "Why did this happen?" Defendant remained silent.

¶ 33 From 11:43 a.m. to approximately 12 p.m., Gallick and Ketter asked defendant about his other romantic relationships. Defendant admitted he had been dating a woman named Katie for over a year when Melissa became pregnant. He admitted Katie did not know anything about Melissa or her pregnancy. He said he planned to break up with Katie on November 25, 2020, but "didn't." He was still in a relationship with Katie at the time of the interrogation. The officers then read defendant's text messages aloud, and defendant agreed that he had sex with someone named Alyssa on the night of November 24, 2020. Ketter commented that defendant was too injured to go to work but not too injured for a "booty call." From 12:07 to 12:11 p.m., defendant did not answer the officers' questions.

¶ 34 From 12:36 to 12:37 p.m., defendant talked about being a paramedic. From 12:39 to 12:47 p.m., Ketter repeatedly asked defendant "what happened" that day, and defendant did not respond. From 12:48 p.m. to 12:52 p.m., Ketter asked defendant why he choked Melissa. Defendant did not respond. At 12:52, defendant said, "I did not hate Melissa." From 12:56 to 1:12 p.m., defendant remained silent while Ketter asked him various questions, including, "What happened?" "What made you snap?" and, "Are you sorry?" At one point, Ketter stated, "You choked her. You beat her. You caused internal injuries. You caused external injuries. You did so

- 11 -

much to her that you thought the only way to hide those injuries was to start a fire." Defendant remained silent.

¶ 35    Defendant admitted that he never contacted Gallick after talking to him the day Melissa died. Ketter suggested that defendant never called Gallick because he already knew what happened. He said, "You aren't asking if we found the killer because you are the killer." From 1:18 to 1:30 p.m., defendant did not respond to Ketter's questions about why he did what he did or to Ketter's statements that he "killed her," "lied," and "set a fire to cover it up." Ketter told defendant that he had his "car on camera," knew "when the fire started," and that defendant was "there at the time of the fire." The video ended at 1:31 p.m., when defendant requested an attorney.

¶ 36    Ketter testified that defendant had no visible reaction to being shown the autopsy photos of Melissa or his unborn child during the interrogation. Ketter testified that defendant never denied killing Melissa or "her baby boy." On cross-examination, Ketter admitted that defendant never said he hit, struck, or strangled Melissa. While he was at the police station, police collected DNA from defendant.

¶ 37    During cross-examination, Ketter testified that he asked Verizon for phone records and obtained them on November 27, 2020. When defense counsel asked whether Ketter was able to determine if a phone call occurred between Melissa and Baal on November 25, 2020, Ketter responded, "I don't recall." Defense counsel then asked Ketter if he reviewed the records of Baal's phone calls. Ketter responded, "I don't recall." Defense counsel then asked if Ketter was "aware that the phone call had been made around 10:00?" The State objected on hearsay grounds, and the trial court sustained the objection.

¶ 38    Later in cross-examination, Ketter testified that he received Melissa's phone records from Verizon. Defense counsel asked Ketter, "Do you recall any phone conversations to

or from Melissa's phone on November 25th?" Ketter responded, "I don't recall." Thereafter, the following colloquy took place between defense counsel and Ketter:

"Q. So did you tell the grand jury that you were, in fact, aware that she was on the phone that day?

A. Yes.

Q. So you are aware that she was on the phone that day?

A. Yes.

Q. So you're aware that she had a conversation, correct?

A. On that day?

Q. Yes.

A. Yes.

Q. And you're aware that conversation ended about 12:22?"

The State objected on hearsay grounds. Defense counsel argued that the State had opened the door because Ketter mentioned the phone call during defendant's interrogation and also argued that defendant could "impeach" Ketter with his grand jury testimony. The trial court sustained the objection.

¶ 39            Ketter agreed that he was "completely and solely" focused on defendant during his investigation. He said he never received or recovered any evidence that "anyone else was involved" in Melissa's murder.

¶ 40            Defendant tendered John Knapp, a fire investigator, as "an expert in the field of fire and arson investigation." Following his testimony, the trial court accepted him as an expert. Knapp testified that he was hired by defendant to review the reports and photographs related to the fire at the Lamesch home. Knapp testified:

"In this particular case, after reviewing the reports or reviewing what information was there, I felt like there was probably more information that could have been gathered that wasn't there or, if it was there, it wasn't reported. And because that information wasn't there, I couldn't make that determination to whether or not—what the cause of the fire should be, other than undetermined."

Knapp admitted that he never went to the scene of the fire and agreed that arson investigators "can do a better job if they go to the scene." Knapp did not dispute that Poel "is an expert in fire investigation" and was "in perfect position to give the opinion he gave" because he was at the scene. Knapp agreed that he "might have been able to make a finding" if he had been at the scene.

¶ 41 During defendant's closing argument, defense counsel mentioned the "very, very long interview with Detective Ketter, Detective Gallick, and *** the police chief of Mount Morris." Defense counsel pointed out that during that interview, defendant said, "I didn't go there with the intention of hurting anyone. I don't go anywhere with the intention of hurting anyone." Defendant also responded, "Absolutely not," when he was asked "if he went there to kill her." Defense counsel stated, "Now, the State is going to argue that all of this silence was somehow a tacit admission by my client. He never admits to doing anything to Melissa."

¶ 42 In rebuttal, the State showed the jury photographs the officers showed defendant during his interrogation and argued:

"So you heard how long the interview was, and you saw him. And these were the photos that were in front of him when he was asked what happened. ***

So he has these photos in front of him for hours, and you got to see that. Applying your common sense, everyday life experience, somebody you've had a longstanding relationship with, a little infant boy that you were about to be a father

- 14 -

of, if somebody puts these photos in front of you, how is a not guilty person going to act? 'I didn't do it. I mean, this long? Seven hours? Are you kidding? Why do you keep accusing me? I didn't do it.' What person says, 'I did not go there with the intent to injure anyone.' I'll tell you. A guilty person. That's who acts that way."

¶ 43 At the jury instruction conference, defense counsel asked the trial court to provide the jury with the following nonpattern instruction:

"You have received evidence in the form of interviews that contain statements of others made outside of the courtroom who did not testify in this case. Those statements are not evidence and should not be considered for their truth."

The State objected. The trial court provided the following nonpattern instruction to the jury instead:

"During this trial, you have received recorded statements of the defendant. These recorded statements contain statements of the investigators. Some of these statements include information not otherwise admitted into evidence. The contents of these statements are not offered for their truth; rather, they are offered to place the defendant's statements and silence into context. You should consider those statements for that purpose only."

¶ 44 The jury found defendant guilty of all charges. Defendant filed a motion for a new trial, asserting, in part, that the trial court erred in (1) allowing the State to play four hours of the police interrogation video recording, (2) prohibiting him from impeaching Ketter or refreshing Ketter's recollection at trial with his grand jury testimony, and (3) allowing his coworkers to provide "irrelevant" testimony. The court denied the motion.

¶ 45 At sentencing, the court ruled that some counts of the indictment merged with others so that defendant would be sentenced on one count each of first degree murder, intentional

homicide of an unborn child and residential arson. The court sentenced defendant to concurrent prison terms of life for first degree murder, 60 years for intentional homicide of an unborn child, and 15 years for residential arson.

¶ 46        This appeal followed.

¶ 47                                 II. ANALYSIS

¶ 48                            A. Interrogation Video

¶ 49        Defendant argues that the trial court abused its discretion in allowing the jury to watch the four-hour redacted version of defendant's police interrogation that took place on August 28, 2021, because it contained (1) lengthy periods of defendant's "postarrest silence" and (2) inflammatory and prejudicial remarks and comments by the officers.

¶ 50                        1. *Defendant's Postarrest Silence*

¶ 51        Defendant argues that the trial court improperly allowed the jury to watch four hours of the police interrogation that included long periods of defendant's silence. The State responds that defendant waived his right to remain silent, so his silence was admissible.

¶ 52        Both parties agree that while neither Ketter nor Gallick formally advised defendant that he was under arrest, defendant was under arrest at the time of his interrogation because he was not free to leave the police station before or during the interrogation. See *People v. Selby*, 241 Ill. App. 3d 80, 83 (1993) ("The standard for determining if and when an arrest has occurred is whether a reasonable man would have concluded that he was not free to leave considering the surrounding circumstances. No formal declaration of arrest is necessary.").

¶ 53                       a. Admissibility of Postarrest Silence

¶ 54        Evidence is admissible if it is relevant and not otherwise excluded by existing law. Ill. R. Evid. 402 (eff. Jan. 1, 2011). " 'Relevant evidence' means evidence having any tendency to

make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ill. R. Evid. 401 (eff. Jan. 1, 2011). "Whether evidence is relevant and admissible at trial is within the trial court's discretion." *People v. Whitfield*, 2018 IL App (4th) 150948, ¶ 46. We will not overturn a trial court's decision to admit evidence unless it is arbitrary, fanciful, or unreasonable. *Whitfield*, 2018 IL App (4th) 150948, ¶ 46.

¶ 55 The United States Supreme Court held in *Doyle v. Ohio*, 426 U.S. 610, 617-19 (1976), that the State may not introduce evidence of a defendant's postarrest silence after the defendant receives *Miranda* warnings. The court reasoned as follows: "Silence in the wake of these warnings may be nothing more than the arrestee's exercise of these *Miranda* rights. Thus every post-arrest silence is insolubly ambiguous because of what the State is required to advise the person arrested." *Doyle*, 426 U.S. at 617. "[T]he rationale behind the rule in *Doyle* is that it would be incongruous to penalize a defendant for invoking his right to silence in response to warnings informing him of his right to silence." *People v. King*, 384 Ill. App. 3d 601, 610 (2008). "Thus, the thrust of the rule in *Doyle* is that a defendant should not be penalized for his silence where *Miranda* warnings induced it." *King*, 384 Ill. App. 3d at 610.

¶ 56 However, "*Doyle* applies only when a defendant invokes his right to remain silent." *People v. Patterson*, 217 Ill. 2d 407, 445 (2005). If a defendant waives his right to remain silent and answers some questions from law enforcement, the State can present evidence of the defendant's silence in response to other questions. See *Patterson*, 217 Ill. 2d at 445; *People v. Foster*, 199 Ill. App. 3d 372, 380-82 (1990); *People v. Chriswell*, 133 Ill. App. 3d 458, 463 (1985). In fact, when the defendant waives his right to remain silent, "the State [is] entitled to introduce the entirety of the conversation" between the police and the defendant. *People v. Jacobs*, 2016 IL

App (1st) 133881, ¶ 93; see *People v. Brown*, 222 Ill. App. 3d 703, 713-14 (1991) ("[W]here a defendant has been advised of his *Miranda* rights and subsequently waives them, the jury may consider the entire communicative process in order to better evaluate the meaning and accuracy of the statements that were made.").

¶ 57 Once a defendant waives his right to remain silent, he can invoke it only by a "positive assertion that he wants to remain silent." *Patterson*, 217 Ill. 2d at 445. Silence alone is not "the type of 'positive assertion' [citation] of the right to remain silent that is necessary to invoke the right once it has been expressly waived." *King*, 384 Ill. App. 3d at 611; see *Foster*, 199 Ill. App. 3d at 382 ("[M]ere silence by an accused does not invoke defendant's right to avoid self-incrimination by terminating the post-arrest interview."). "This is especially true ***, where, after defendant's silence, the interview continued for even more questioning before defendant affirmatively stated that he no longer wished to speak to police." *King*, 384 Ill. App. 3d at 611. A statement is sufficient to invoke the right to remain silent if it is " 'simple, unambiguous,' " and conveys that the "defendant does 'not want to talk with the police.' " *People v. Nash*, 2024 IL App (4th) 221078, ¶ 142 (quoting *Berghuis v. Thompkins*, 560 U.S. 370, 382 (2010)).

¶ 58 Here, defendant waived his right to remain silent when he talked to officers after receiving and signing the form containing *Miranda* warnings. Defendant's subsequent silence during the interrogation was insufficient to reinvoke the rights he waived. See *King*, 384 Ill. App. 3d 601; *Foster*, 199 Ill. App. 3d at 382. Additionally, defendant's statement, made shortly after 11 a.m., that the *Miranda* form he signed "said [he] had a right to not say anything," was not the type of "positive assertion" necessary to invoke his right to remain silent. See *Patterson*, 217 Ill. 2d at 445. To invoke his right to remain silent after voluntarily answering questions, defendant had to clearly and unambiguously state that he no longer wanted to talk to the police. See *Nash*, 2024 IL

- 18 -

App (4th) 221078, ¶ 142. Defendant never did that. Instead, defendant continued to engage in conversation with the officers by answering some of the questions they asked for nearly two hours after 11 a.m., thereby establishing that it was not defendant's intent to exercise his right to remain silent at that point. See *King*, 384 Ill. App. 3d at 611.

¶ 59    Defendant, however, contends that his silence was inadmissible pursuant to our supreme court's decision in *People v. Pinkett*, 2023 IL 127223. In that case, our supreme court stated as follows:

"Under Illinois's evidentiary law, '[e]vidence of the defendant's postarrest silence is considered neither material nor relevant to proving or disproving the charged offense.' *People v. Sanchez*, 392 Ill. App. 3d 1084, 1096 (2009). *Sanchez* is based on a line of cases beginning with *People v. Rothe*, 358 Ill. 52 (1934). In *Rothe*, this court determined that the admission of evidence that the defendants refused to make a statement at the police station was improper. *Id.* at 57. 'In this refusal they were within their rights, and the fact that they refused to make a statement had no tendency to either prove or disprove the charge against them.' *Id.* The court found the evidence 'neither material nor relevant' and held it should be excluded as prejudicial. *Id.* In *People v. Lewerenz*, 24 Ill. 2d 295, 299 (1962), this court again found that admission of evidence that 'at the time of his arrest defendant had refused to make a statement on advice of counsel' was 'prejudicial error.' Relying on *Rothe*, the court determined the evidence to be neither material nor relevant. *Id.*" *Pinkett*, 2023 IL 127223, ¶ 31.

¶ 60    The defendants in *Pinkett* and the cases cited therein are not similarly situated to defendant because the defendants in those cases refused to talk to police at all. See *Pinkett*, 2023

IL 127223, ¶ 31 (citing *Rothe*, 358 Ill. at 57, and *Lewerenz*, 24 Ill. 2d at 299). When a defendant completely refuses to talk to police, his silence is "insolubly ambiguous; that is, it is unknown whether a defendant's silence is nothing more than the exercise of the defendant's rights." (Internal quotation marks omitted.) *Pinkett*, 2023 IL 127223, ¶ 34 (quoting *People v. Givens*, 135 Ill. App. 3d 810, 820 (1985)). Unlike a defendant who remains completely silent, "[a] defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent." *Anderson v. Charles*, 447 U.S. 404, 408 (1980). Thus, his silence is not ambiguous.

¶ 61       Here, defendant's silence was not induced by *Miranda* warnings but, rather, was induced by difficult questions officers asked defendant after he waived his *Miranda* rights. See *King*, 384 Ill. App. 3d at 610. Thus, the rationale underlying *Doyle*, which the supreme court relied upon in *Pinkett*, does not apply. See *King*, 384 Ill. App. 3d at 610.

¶ 62       Because defendant waived his right to remain silent and never invoked that right during the police interrogation, everything defendant said or did not say during the interrogation was admissible. See *Patterson*, 217 Ill. 2d at 445; *Jacobs*, 2016 IL App (1st) 133881, ¶ 92. Thus, the trial court did not abuse its discretion in denying defendant's motion *in limine* and allowing the jury to watch the four-hour edited version of defendant's interrogation containing lengthy periods of defendant's silence.

¶ 63                              b. State's Closing Argument

¶ 64       Defendant further contends that the State improperly commented on his silence during closing argument. We reject this contention for several reasons. First, defendant forfeited this issue by failing to object to the State's closing argument at trial and failing to raise it in his posttrial motion. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) (holding that to preserve an issue for appeal, both a trial objection and a written posttrial motion raising the issue are

necessary). Thus, we can only review this issue if defendant can establish plain error. See *People v. Thompson*, 238 Ill. 2d 598, 613 (2010).

¶ 65        The plain-error doctrine applies when "a clear or obvious error has occurred" and (1) " 'the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant' " or (2) the " 'error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process.' " *Thompson*, 238 Ill. 2d at 613 (quoting *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007)). The first step in any plain error analysis is to determine if error occurred. *Thompson*, 238 Ill. 2d at 613.

¶ 66        Here, there was no error in the State's closing argument. The State is prohibited from commenting on a defendant's postarrest silence only if the defendant invokes his right to remain silent. See *Patterson*, 217 Ill. 2d at 444-45. As explained above, defendant did not invoke his right to remain silent but waived that right by answering some of the officers' questions. Because defendant did not exercise his right to remain silent, the State was free to comment on defendant's postarrest silence. See *Patterson*, 217 Ill. 2d at 443-444; *People v. Trumbull*, 67 Ill. App. 3d 262, 264-65 (1978). Thus, there was no error, and therefore, no plain error. See *Thompson*, 238 Ill. 2d at 613.

¶ 67                                    2. *Officers' Statements*

¶ 68        Defendant further contends that his counsel was ineffective for not (1) attempting to redact from the video-recorded interview statements made by the officers that were "inadmissible" and "prejudicial" and (2) requesting an "appropriate" limiting instruction.

¶ 69        To establish that he received ineffective assistance of counsel, a defendant must show that (1) counsel's performance fell below an objective standard of reasonableness and (2) the defendant was prejudiced by counsel's deficient performance. *People v. Cherry*, 2016 IL 118728,

¶ 30 (citing *Strickland v. Washington*, 466 U.S. 668, 694 (1984)). "[T]o prevail on an ineffective assistance claim under *Strickland*, a defendant must establish both prongs of the *Strickland* test." *Cherry*, 2016 IL 118728, ¶ 31.

¶ 70        To establish that a defendant was prejudiced by counsel's deficiencies, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Where the State presents "strong evidence of [the] defendant's guilt" at trial, the defendant cannot demonstrate that a reasonable probability exists that the result of the trial would have been different but for counsel's erroneous performance. *People v. Lewis*, 2017 IL App (1st) 150070, ¶ 29; see *People v. Reber*, 2019 IL App (5th) 150439, ¶ 86 (concluding that the defendant was not prejudiced by his counsel's error where the evidence against defendant was "strong").

¶ 71                                a. Redaction

¶ 72        Defendant argues his counsel was ineffective for failing to move to redact portions of the video-recorded interrogation where officers "expressed their own conclusions regarding [defendant's] guilt" and "referenced other bad acts and misconduct" by defendant.

¶ 73        Questions and statements made by police officers during an interrogation are admissible if (1) they are "helpful to the jury so as to place the defendant's responses (or lack thereof) into context" and (2) their prejudicial effect does not substantially outweigh their probative value. *Whitfield*, 2018 IL App (4th) 150948, ¶ 48. Officers' questions and statements during an interrogation are "helpful" when they provide "context for what occurred during the police interrogation" and are "useful in explaining [the] defendant's statements and admissions."

*Whitfield*, 2018 IL App (4th) 150948, ¶ 49. In other words, officers' statements and questions are "helpful" when "the meaning and significance of [a] defendant's answers, comments, behaviors— or even, at times, his silence—would be difficult to discern." *Whitfield*, 2018 IL App (4th) 150948, ¶ 49.

¶ 74　　　　An officer's statements or comments during an interrogation about the defendant's guilt or credibility do not constitute improper lay opinion testimony. See *People v. Davila*, 2022 IL App (1st) 190882, ¶ 51; *Whitfield*, 2018 IL App (4th) 150948, ¶ 58; see also *People v. Moore*, 2012 IL App (1st) 100857, ¶ 52 (finding that "police accusations may be seen as a standard interrogation tactic, rather than an improper opinion on [the defendant's] credibility"). "[S]tatements of past opinions, rather than present ones, do not constitute improper lay opinion testimony." *Whitfield*, 2018 IL App (4th) 150948, ¶ 58 (citing *People v. Hanson*, 238 Ill. 2d 74, 101 (2010)). Officers' statements recorded on interrogation videos are "not testimony," nor are they statements of present opinions. *Whitfield*, 2018 IL App (4th) 150948, ¶ 58. Thus, statements from officers, "including opinions and observations as to a defendant's guilt or credibility, may be presented in the videotaped interrogation even if they are inadmissible as direct testimony." *Davila*, 2022 IL App (1st) 190882, ¶ 51.

¶ 75　　　　"Generally, evidence showing that a defendant committed prior bad acts is improper where its purpose is to demonstrate the defendant's propensity to commit a crime." *People v. Davis*, 248 Ill. App. 3d 886, 891 (1993). Such evidence, however, is admissible for other purposes, such as "to prove intent, *modus operandi*, identity, motive, absence of mistake, and any material fact other than propensity that is relevant to the case." *People v. Donoho*, 204 Ill. 2d 159, 170 (2003). Any reference in a video-recorded police interrogation to other crimes committed by

- 23 -

the defendant should be excluded as unfairly prejudicial where it is offered only to demonstrate propensity. See *Moore*, 2012 IL App (1st) 100857, ¶¶ 49-51.

¶ 76     Here, Ketter's, Gallick's, and White's statements and questions were helpful and useful to place into context defendant's (1) silence when confronted with questions about his involvement in Melissa's death and (2) responses when asked about his plans and intentions in going to Melissa's house on the day of her death. Without their statements and questions, the jury would not understand the meaning and significance of defendant's answers, silence, and behavior during the police interrogation. See *Whitfield*, 2018 IL App (4th) 150948, ¶ 49.

¶ 77     Defendant contends that the officers' statements during the interrogation that they believed he was guilty constituted improper opinions about "the ultimate question of fact." We disagree for several reasons. First, the statements were made during an interrogation, not at trial, so they did not constitute "testimony." See *Whitfield*, 2018 IL App (4th) 150948, ¶ 58; see also *Davila*, 2022 IL App (1st) 190882, ¶ 51 (holding that statements from officers, "including opinions and observations as to a defendant's guilt or credibility, may be presented in the videotaped interrogation even if they are inadmissible as direct testimony"). Furthermore, the officers' statements constituted past opinions, rather than present ones, which are admissible. *Whitfield*, 2018 IL App (4th) 150948, ¶ 58; *Hanson*, 238 Ill. 2d at 101. The officers' accusations and statements did not amount to improper opinion testimony but were merely "a standard interrogation tactic." *Moore*, 2012 IL App (1st) 100857, ¶ 52. Neither Gallick nor Ketter testified at trial that they believed defendant was guilty. Thus, they did not provide improper opinions about "the ultimate question of fact."

¶ 78     Furthermore, the officers' references to "bad acts" allegedly committed by defendant did not constitute inadmissible propensity evidence. Defendant claims that his counsel

should have moved to redact the officers' statements that he committed "bad acts" where the officers (1) mentioned that murder can sometimes be the result of "domestic violence," (2) suggested that people may believe he had sex with a corpse, and (3) discussed him cheating on his girlfriend with Melissa and other women. With respect to the first contention, Gallick generally discussed murder and stated that murder is sometimes the result of domestic violence that has escalated to the point that "somebody ends up dying." However, Gallick never stated or even suggested that defendant committed domestic violence. As such, Gallick's statement was not an improper reference to a "prior bad act" committed by defendant to prove his propensity to commit crime.

¶ 79 Turning to the second contention, White suggested that people may think that defendant had "sex with a corpse" if he did not tell officers what happened at Melissa's house. This was not an improper comment about a "prior bad act" committed by defendant because White's statement (1) did not refer to something defendant had done previously but referred to his conduct related to Melissa and (2) suggested a hypothetical scenario. Furthermore, soon after White made this statement, Ketter asked defendant if Melissa was alive when he had sex with her. Defendant responded, "Of course she was." Thus, White's statement did not constitute an improper statement about a "prior bad act" committed by defendant.

¶ 80 Finally, the officers' discussion of defendant cheating on his girlfriend was relevant for a purpose other than propensity, specifically, defendant's motive to kill Melissa. While defendant seems to concede that his relationship with Katie was relevant to show motive, he contends that the officers' discussion of his other relationships was not. However, the only other relationship the officers discussed in depth was defendant's relationship with Alyssa. That relationship was relevant because defendant had sex with Alyssa the night before Melissa's death,

when he claimed he was injured. Furthermore, defendant has cited no case law supporting his assertion that infidelity is a "bad act" that must be redacted from a video-recorded interview and, therefore, has forfeited that contention. See *Gakuba v. Kurtz*, 2015 IL App (2d) 140252, ¶ 19 (stating the failure to cite authority in support of a contention results in forfeiture). Defendant has failed to show that any of the officers' statements about "prior bad acts" were substantially more prejudicial than probative.

¶ 81        Moreover, the prejudicial effect of the officers' statements did not exceed their probative value because the jury was instructed that the officers' statements were not offered for the truth of the matters asserted. The prejudicial effect of evidence is diminished when the jury receives a limiting instruction about its use of the evidence. See *People v. Williams*, 2015 IL App (1st) 130097, ¶ 52; *People v. Barner*, 374 Ill. App. 3d 963, 972 (2007). The jury is presumed to follow the instructions the trial court gives. *Williams*, 2015 IL App (1st) 130097, ¶ 52.

¶ 82        Here, the trial court instructed the jury that the officers' statements that included information not otherwise presented at trial were "not offered for their truth" but were "offered to place the defendant's statements and silence into context" and should be considered "for that purpose only." Because the jury was instructed not to consider the officers' statements for their truth, the probative value of the officers' statements and questions was not substantially outweighed by their prejudicial effect. See *People v. Bryant*, 391 Ill. App. 3d 228, 244 (2009) (finding that the probative value of recordings of the defendants' interviews with police was not outweighed by prejudice where the court "gave a limiting instruction specifically directed at the concern that the jury might consider the investigators' hypothetical scenarios as evidence").

¶ 83        Defendant, however, argues the Third District's decision in *People v. Hardimon*, 2017 IL App (3d) 120772, is controlling. We disagree for several reasons. First, in *Whitfield*, we

rejected the "necessary" standard imposed by the Third District in *Hardimon* for determining whether the officers' statements and questions were probative and instead applied the "helpful" standard discussed above. See *Whitfield*, 2018 IL App (4th) 150948, ¶ 48. Moreover, in *Hardimon*, the officers' statements to the defendant during the interrogation were purely inflammatory, rather than helpful to contextualize the defendant's responses, where the detectives told the defendant that (1) "the media would use the word 'execute' next to [his] picture," (2) his "failure to implicate himself" would "prevent [him] from seeing his son," and (3) he "was going to jail for first degree murder." *Hardimon*, 2017 IL App (3d) 120772, ¶ 36. According to the Third District, the officer's statements "served only to paint the defendant as a 'cold-blooded' murderer, bolster the State's case, and disparage the defendant." *Hardimon*, 2017 IL App (3d) 120772, ¶ 38.

¶ 84        Here, the officers made no such statements. While the detectives made some accusations against defendant during the interrogation, those were intended to obtain a verbal reaction from defendant when he stopped answering questions, rather than merely to paint him as a " 'cold-blooded' murderer" or disparage him. Furthermore, the prejudicial impact of the statements by the officers in *Hardimon* was much greater because the jurors in that case were never instructed that the officers' statements were not to be considered for their truth, like the jurors here were.

¶ 85        Finally, in *Hardimon*, the Third District found that defense counsel's failure to seek redaction of the video-recorded interview prejudiced the defendant because the totality of the evidence "failed to directly connect the defendant to the crime." *Hardimon*, 2017 IL App (3d) 120772, ¶ 39. Specifically, the court noted that "[n]o witness identified the defendant as the shooter, the defendant never admitted the charged offenses and the physical evidence did not directly connect the defendant to the offense." *Hardimon*, 2017 IL App (3d) 120772, ¶ 39.

¶ 86        Here, unlike the defendant in *Hardimon*, defendant cannot establish prejudice because the State presented strong evidence at trial to prove his guilt. Two pathologists testified that Melissa was strangled to death in her home on the afternoon of November 25, 2020. Defendant was scheduled to work that day, but he "called off." Instead of going to work, defendant admittedly showed up to Melissa's house unannounced that afternoon. When he arrived, Melissa told her sister, who was on the phone with her, that she would "make the conversation quick" and "call [her] right back," but she never did. Melissa's neighbor saw a man matching defendant's description enter Melissa's home that afternoon and did not see anyone else enter the house thereafter. The only DNA found under Melissa's fingernails and in her vagina belonged to defendant. Melissa's body was found in the kitchen, where a fire had intentionally been set. Defendant provided police with no proof of his whereabouts that day before 5:20 p.m., when his car was recorded on camera at Resource Bank in Malta. Finally, while defendant repeatedly told the officers during his very long interrogation that he had no "intention" or "plan" to hurt or kill Melissa, he never stated that he did not hurt or kill Melissa.

¶ 87        Because the evidence against defendant was strong and directly connected him to the crimes he was charged with, there is no reasonable probability that, but for counsel's claimed errors, the jury's verdicts would have been different if the officers' questions and statements were redacted from the video-recorded interrogation. See *Lewis*, 2017 IL App (1st) 150070, ¶ 29; *Reber*, 2019 IL App (5th) 150439, ¶ 86. Thus, even if defense counsel's performance in failing to seek a redaction of the video was deficient, defendant's ineffective assistance claim still fails.

¶ 88                          b. Limiting Instruction

¶ 89 Defendant also asserts that his counsel was ineffective for failing to request that an "appropriate limiting instruction" be provided to the jury about how it should consider the officers' statements during his interrogation.

¶ 90 In *People v. Keys*, 2023 IL App (4th) 210630, ¶ 74, the defendant asserted that his counsel was ineffective for not requesting limiting instructions as to how the jury should consider the officers' statements during their interview with him. We ruled that the defendant's claim had no merit because there is no precedent establishing that such instructions are necessary. *Keys*, 2023 IL App (4th) 210630, ¶ 74, *aff'd in part, vacated in part, and rev'd in part*, 2025 IL 130110. Because no limiting instruction was necessary, defendant, here, cannot establish that his counsel performed deficiently by failing to request an "appropriate limiting instruction."

¶ 91 Nonetheless, defense counsel did request a limiting instruction to explain to the jury how it should consider the officers' statements during the interrogation video. Specifically, defense counsel suggested the following instruction: "You have received evidence in the form of interviews that contain statements of others made outside of the courtroom who did not testify in this case. Those statements are not evidence and should not be considered for their truth." In response to the State's objection to that instruction, the trial court drafted its own, which it provided to the jury:

> "During this trial, you have received recorded statements of the defendant. These recorded statements contain statements of the investigators. Some of these statements include information not otherwise admitted into evidence. The contents of these statements are not offered for their truth; rather, they are offered to place the defendant's statements and silence into context. You should consider those statements for that purpose only."

¶ 92    Defendant contends that the trial court's instruction was insufficient because it failed to inform jurors which of the investigators' statements they could not consider for their truth. We disagree. The instruction makes clear that the jurors were not to consider for their truth any statements made by the investigators that included "information not otherwise admitted into evidence." This instruction sufficiently informed the jury that they should consider such statements only to "place the defendant's statements and silence into context." This was an appropriate instruction; thus, defense counsel was not deficient for failing to request an "appropriate limiting instruction."

¶ 93                    B. Ketter's Grand Jury Testimony

¶ 94    Next, defendant argues that the trial court abused its discretion in failing to allow his counsel to impeach Ketter with a "prior inconsistent statement" he made before the grand jury. Defendant further argues that his counsel was ineffective for failing to attempt to introduce Ketter's grand jury testimony as substantive evidence.

¶ 95    "The admission of evidence is within the sound discretion of a trial court, and a reviewing court will not reverse the trial court absent a showing of an abuse of discretion." *People v. Becker*, 239 Ill. 2d 215, 234 (2010). "An abuse of discretion occurs where the trial court's decision is arbitrary, fanciful or unreasonable [citation] or where no reasonable person would agree with the position adopted by the trial court." *Becker*, 239 Ill. 2d at 234.

¶ 96    A party may attack the credibility of a witness at trial by impeaching him with a prior inconsistent statement. *People v. Lewis*, 2017 IL App (4th) 150124, ¶ 34. "When a witness is impeached with statements made by him out of court, those statements may not be considered for their truth—that is, they do not constitute substantive evidence." *Lewis*, 2017 IL App (4th) 150124, ¶ 35. "The fact that the witness made different, contradictory statements should be used

- 30 -

*only* to undermine the credibility of the witness." (Emphasis in original.) *Lewis*, 2017 IL App (4th) 150124, ¶ 35.

¶ 97    Additionally, "[p]rior inconsistent statements can be admitted as substantive evidence when they meet the statutory requirements for admissibility." *People v. Ware*, 2019 IL App (1st) 160989, ¶ 34 (citing 725 ILCS 5/115-10.1 (West 2016)). Section 115-10.1 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-10.1 (West 2024)) provides, in pertinent part:

"In all criminal cases, evidence of a statement made by a witness is not made inadmissible by the hearsay rule if

(a) the statement is inconsistent with his testimony at the hearing or trial, and

(b) the witness is subject to cross-examination concerning the statement, and

(c) the statement—

(1) was made under oath at a trial, hearing, or other proceeding."

A trial witness's grand jury testimony is properly admitted as substantive evidence at trial under paragraph (c)(1) if the witness's trial testimony differs from his grand jury testimony. See *People v. Harvey*, 366 Ill. App. 3d 910, 921 (2006). A witness's testimony that he does not remember his prior statement is sufficient to render his trial testimony inconsistent with the statements he previously made. See *People v. Mays*, 2023 IL App (4th) 210612, ¶ 83.

¶ 98    Even if a statement is admissible as substantive evidence under section 115-10.1 of the Code, the content of the statement must also be admissible under the rules of evidence. See

*People v. Thomas*, 178 Ill. 2d 215, 237 (1997) (stating that the admission of a prior inconsistent statement presented a "hearsay within hearsay problem"); *People v. Radovick*, 275 Ill. App. 3d 809, 822 (1995) (finding that the admission of grand jury testimony under section 115-10.1 was improper because it contained "double hearsay and evidence of other crimes").

¶ 99    " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Ill. R. Evid. 801(c) (eff. Jan. 1, 2011). Hearsay is not admissible unless it falls within a recognized exception. Ill. R. Evid. 802 (eff. Jan. 1, 2011). "The proponent of the evidence bears the burden of establishing that it falls within a hearsay exception." *U.S. Bank National Ass'n v. Stachewicz*, 2025 IL App (4th) 241504-U, ¶ 25.

¶ 100    Before a prior inconsistent statement can be offered as substantive evidence or impeachment, a proper foundation must be laid. *People v. Grayson*, 321 Ill. App. 3d 397, 406 (2001); *People v. Hallbeck*, 227 Ill. App. 3d 59, 62 (1992). "Part of the necessary foundation is asking the witness whether he made the inconsistent statement." *Hallbeck*, 227 Ill. App. 3d at 62. To do so, "the questioner must direct the attention of the witness to the time, place, and circumstances of the statement and its substance." *Hallbeck*, 227 Ill. App. 3d at 62. "The witness must have an opportunity to explain the inconsistency before the introduction of extrinsic evidence of the statement; this requirement prevents unfair surprise and gives the witness an opportunity to explain any inconsistency." *Hallbeck*, 227 Ill. App. 3d at 62. "Through this process, the opponent to the admission of the statement is properly alerted to the existence of the statement and thus is able to cross-examine the witness regarding it." *Hallbeck*, 227 Ill. App. 3d at 62.

¶ 101    1. *Trial Court's Failure to Allow Impeachment*

¶ 102    Defendant argues that the trial court abused its discretion by prohibiting defense counsel from impeaching Ketter with his grand jury testimony. We disagree.

¶ 103    At trial, Ketter testified that he did not recall any phone calls made to or from Melissa's phone on November 25, 2020. Thereafter, defense counsel asked Ketter about his grand jury testimony, and Ketter agreed that he told "the grand jury" he was "aware that [Melissa] was on the phone that day." When defense counsel asked Ketter if he was "aware that conversation ended about 12:22," the State objected on hearsay grounds, and the trial court sustained the objection.

¶ 104    To properly impeach Ketter with his prior grand jury testimony, defense counsel had to lay a proper foundation. See *Grayson*, 321 Ill. App. 3d at 406. This required counsel to direct Ketter to the time, place, and circumstances of the statement, as well as its substance. See *Hallbeck*, 227 Ill. App. 3d at 62. Then counsel had to ask Ketter if he made the statement. If Ketter acknowledged making the statement, then there could be no impeachment. See *Grayson*, 321 Ill. App. 3d at 406. Only if Ketter denied making the statement or claimed he did not remember making the statement could defense counsel then introduce the statement to impeach him. See *Hallbeck*, 227 Ill. App. 3d at 62.

¶ 105    Here, defense counsel never asked Ketter about a prior statement he made to the grand jury about when the phone call between Melissa and Baal ended. Instead, defense counsel asked Ketter if he was "aware that conversation ended about 12:22." Because defense counsel's question made no reference to a prior statement made by Ketter, it was not phrased to give Ketter the opportunity to either admit or deny making the statement. As such, defense counsel failed to lay the necessary foundation to impeach Ketter with a prior inconsistent statement. See *Grayson*,

321 Ill. App. 3d at 406; *Hallbeck*, 227 Ill. App. 3d at 62. Thus, the trial court did not abuse its discretion in sustaining the State's objection to defense counsel's question.

¶ 106   2. *Counsel's Failure to Introduce Testimony as Substantive Evidence*

¶ 107   Defendant also argues that his counsel was ineffective for not attempting to introduce Ketter's "inconsistent statement" as substantive evidence. We disagree.

¶ 108   Whether a prior inconsistent statement is used for impeachment or as substantive evidence, a proper foundation must be laid. *Grayson*, 321 Ill. App. 3d at 406. As set forth above, defense counsel failed to lay a proper foundation for Ketter's prior inconsistent statement. Thus, the statement was neither admissible for impeachment nor as substantive evidence.

¶ 109   Even if defense counsel's failure to provide a proper foundation for admission of Ketter's prior inconsistent statement constituted ineffective assistance, defendant's ineffective assistance claim still fails because the substance of Ketter's grand jury testimony was inadmissible hearsay. While hearsay is allowed in grand jury proceedings (see *People v Pulgar*, 323 Ill. App. 3d 1001, 1010 (2001)), it is inadmissible at trial unless it falls within an exception to the hearsay rule (Ill. R. Evid. 802 (eff. Jan. 1, 2011)). Defendant, who sought admission of the statement, bore the burden of proving that it fell within a hearsay exception. See *U.S. Bank*, 2025 IL App (4th) 241504-U, ¶ 25.

¶ 110   Here, defendant made no attempt to show that the substance of Ketter's testimony fell within a hearsay exception. As such, Ketter's grand jury testimony was inadmissible. See *Thomas*, 178 Ill. 2d at 237; *Radovick*, 275 Ill. App. 3d at 821-22. Because Ketter's grand jury testimony was inadmissible as a prior inconsistent statement under section 110-15 of the Code, defendant has failed to establish deficient performance by his counsel.

¶ 111   C. Coworkers' Testimony

- 34 -

¶ 112      Defendant also argues that the trial court abused its discretion in allowing his coworkers, Conlon and Kanzia, to testify at trial because their testimony was more prejudicial than probative.

¶ 113      "Evidence is admissible when it is relevant to an issue and its probative value is not substantially outweighed by its prejudicial effect." *People v. Clark*, 2018 IL App (2d) 150608, ¶ 26 (citing Ill. R. Evid. 403 (eff. Jan. 1, 2011)). "Evidence is relevant if it has any tendency to make the existence of any fact that is consequential to the determination of an action either more or less probable than it would be without the evidence." *Clark*, 2018 IL App (2d) 150608, ¶ 26 (citing Ill. R. Evid. 401 (eff. Jan. 1, 2011)). "[I]t is within the trial court's discretion whether evidence is relevant and admissible, and its decision will not be reversed absent an abuse of discretion." *Clark*, 2018 IL App (2d) 150608, ¶ 26.

¶ 114      During the interrogation, defendant stated that after Melissa's death, he was "pretty shaken up." As such, the testimony of defendant's coworkers, who worked with defendant three days after Melissa's death, was relevant to establish if his demeanor shortly after Melissa's death was consistent with the description he provided during his interrogation. Additionally, Conlon's testimony was relevant to contextualize defendant's statement during the interrogation that he had taken two weeks off work after Melissa's death "to grieve." Conlon testified that he and his coworkers, including defendant, had two weeks off work beginning in late November because he tested positive for COVID-19. This testimony was relevant to address defendant's statement and put it into context. Here, the trial court did not abuse its discretion in ruling that the testimony of defendant's coworkers was more probative than prejudicial.

¶ 115                    D. Cumulative Error

- 35 -

¶ 116 Finally, defendant argues that even if each of his claims of error do not individually constitute reversible error, they cumulatively deprived him of a fair trial, so his convictions should be reversed.

¶ 117 Where none of a defendant's claims constitute error, "there is no error to accumulate and no cumulative error." *People v. Saulsberry*, 2021 IL App (2d) 181027, ¶ 90. Here, we have determined that none of the alleged errors defendant raised on appeal constituted errors. Thus, defendant cannot establish cumulative error.

¶ 118                                  III. CONCLUSION

¶ 119 For the reasons stated, we affirm the trial court's judgment.

¶ 120 Affirmed.